UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Bluefire Wireless, Inc., <br><br>                 Plaintiff, <br><br> -against- <br><br> Cloud9 Mobile Communications, Ltd., Cloud9 Mobile Communications (Wholesale Services), Ltd., Cloud9 Mobile International, Ltd., Wire9 Telecom, Ltd., Cloud9 Mobile Communications PLC, David Sutton, Lee Jones, Jean Christophe Viguier, and Martin Holloway, <br><br>                 Defendants. | Case No. 09 CV 7268 (HB)(FM) <br><br> ECF CASE <br><br><br> **DECLARATION OF JEAN CHRISTOPHE VIGUIER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

     I, JEAN CHRISTOPHE VIGUIER, am over the age of eighteen, have personal knowledge of, and am competent to testify to, the facts set forth below, and declare the following to be true and correct pursuant to 28 U.S.C. §1746:

          1.    I am a named defendant in this action, and a director of the named defendants (1) Cloud9 Mobile Communications, Ltd., formerly known as Defendant Cloud9 Mobile Communications PLC, (2) Cloud9 Mobile Communications (Wholesale Services), Ltd., (3) Cloud9 Mobile International, Ltd., and (4) Wire9 Telecom, Ltd.

          2.    I submit this Declaration in support of the joint application of Defendants for dismissal of Plaintiff's Complaint (1) pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 12(b)(2) for lack of personal jurisdiction, or, alternatively, (2) pursuant to FRCP Rule 12(b)(3) for improper venue and *forum non conveniens*, or, alternatively, (3) pursuant to FRCP Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

This Court Does Not Have Personal Jurisdiction Over The Defendants

3.    I am a French citizen who has resided at 10, rue de Lenningen, L-5411 Canach, Luxembourg since 2006. I have never owned or leased real property located in New York.

4.    I was never served with the Plaintiff's Complaint, but received a copy in Luxembourg in my capacity as a director of Cloud9 Mobile Communications, Ltd. (formerly known as Defendant Cloud9 Mobile Communications PLC), Cloud9 Mobile Communications (Wholesale Services), Ltd. ("Cloud9 Wholesale"), Cloud9 Mobile International, Ltd., and Wire9 Telecom, Ltd.

5.    I have never personally had an office in New York, solicited business in New York, had bank accounts or other property in New York, or had employees or agents in New York.

6.    I have never personally transacted business with the Plaintiff in New York or any other jurisdiction.

7.    I have never personally contracted with Plaintiff anywhere to supply goods or services in New York or any other jurisdiction.

8.    To the extent that Plaintiff's Complaint claims that I committed a tortious act, I deny it.

9.    I have had very limited contact with Plaintiff, which always occurred from my offices in Luxembourg or in the United Kingdom. My limited communications with the Plaintiff were in my capacity as a director of Cloud9 Wholesale and concerned issues related to Plaintiff's existing contractual relationship with Cloud9 Wholesale.

10.     My only physical contact with Plaintiff was when I met with Armand Ventura, who is upon information and belief an officer of Plaintiff, in London at the end of 2007. This meeting concerned Plaintiff existing contractual relationship with Cloud9 Wholesale and its purpose was to introduce myself as a representative of the new majority sharcholder of Cloud9 Wholesale.

11.     Neither I nor any of the company Defendants have met with Plaintiff in New York.

12.     I have never personally or through an agent done or solicited business in New York, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or services rendered in New York.

13.     I had no reason to foresee any injury to Plaintiff in New York and have never personally derived substantial revenue from interstate or international commerce.

14.     I am a director of Defendant Cloud9 Mobile Communications, Ltd., formerly known as Cloud9 Mobile Communications PLC. Cloud9 Mobile Communications, Ltd. is an Isle of Man company with its principal place of business in the Isle of Man.

15.     Defendant Cloud9 Mobile Communications, Ltd. was never properly served, but received in the United Kingdom a copy of the Complaint on or after July 21, 2009.

16.     Defendant Cloud9 Mobile Communications, Ltd. is a fully licensed Public Mobile Network that holds a 2G/3G GSM license within the Isle of Man. It issues mobile telephone numbers in the Isle of Man and supplies SIM cards directly to mobile telephone end users in the Isle of Man. Its employees all work and reside in the United Kingdom and the Isle of Man. It does not maintain any offices in New York, nor any state in the United States, and is

3

TW

not licensed to do business in New York. The company does not have a registered agent for service of process in New York; it has no New York subsidiaries, divisions or affiliates; it has no New York telephone listing or mailing address; it does not advertise or solicit business in New York; it does not have any bank accounts in New York; and it does not have any agents in New York.

17.    Defendant Cloud9 Mobile Communications, Ltd. has never owned or leased real property located in New York.

18.    Defendant Cloud9 Mobile Communications, Ltd. has never transacted business with the Plaintiff in New York or any other jurisdiction.

19.    Defendant Cloud9 Mobile Communications, Ltd. has never contracted with Plaintiff anywhere to supply goods or services in New York or any other jurisdiction.

20.    To the extent that Plaintiff's Complaint claims that Defendant Cloud9 Mobile Communications, Ltd. committed a tortious act, the company denies it.

21.    Defendant Cloud9 Mobile Communications, Ltd. has had no contact with Plaintiff.

22.    Defendant Cloud9 Mobile Communications, Ltd. has never done or solicited business in New York, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or services rendered in New York.

23.    Defendant Cloud9 Mobile Communications, Ltd. had no reason to foresee any injury to Plaintiff in New York while deriving substantial revenue from interstate or international commerce.

4

24.    I am a director of Defendant Cloud9 Mobile International, Ltd.  Defendant Cloud9 Mobile International, Ltd. is an English company with its principal place of business in the United Kingdom.

25.    Defendant Cloud9 Mobile International, Ltd. was not properly served, but received in the United Kingdom a copy of the Complaint on or after July 21, 2009.

26.    Defendant Cloud9 Mobile International, Ltd. is the parent company of the other named company defendants.  Its employees all work and reside in the United Kingdom, the Isle of Man, and Italy.  It does not maintain any offices in New York, nor any state in the United States, and is not licensed to do business in New York.  The company does not have a registered agent for service of process in New York; it has no New York subsidiaries, divisions or affiliates; it has no New York telephone listing or mailing address; it does not advertise or solicit business in New York; it does not have any bank accounts in New York; and it does not have any agents in New York.

27.    Defendant Cloud9 Mobile International, Ltd. has never owned or leased real property located in New York.

28.    Defendant Cloud9 Mobile International, Ltd. has never transacted business with the Plaintiff in New York or any other jurisdiction.

29.    Defendant Cloud9 Mobile International, Ltd. has never contracted with Plaintiff anywhere to supply goods or services in New York or any other jurisdiction.

30.    To the extent that Plaintiff's Complaint claims that Defendant Cloud9 Mobile International, Ltd. committed a tortious act, the company denies it.

31.    Defendant Cloud9 Mobile International, Ltd. has had very limited contact with Plaintiff, which, upon information and belief, consisted of its employee,

5

Martin Holloway, meeting with Armand Ventura and/or Mark Fletcher of Plaintiff in London in or about February and March 2008 in order to make an introduction and conduct general business discussions.

32.    Defendant Cloud9 Mobile International, Ltd. has never done or solicited business in New York, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or services rendered in New York.

33.    Defendant Cloud9 Mobile International, Ltd. had no reason to foresee any injury to Plaintiff in New York while deriving substantial revenue from interstate or international commerce.

34.    I am a director of Defendant Wire9 Telecom, Ltd. Defendant Wire9 Telecom, Ltd. is an English company with its principal place of business in the United Kingdom.

35.    Defendant Wire9 Telecom, Ltd. was not properly served, but received in the United Kingdom a copy of the Complaint on or after July 21, 2009.

36.    Defendant Wire9 Telecom, Ltd. is a company in the business of providing telecommunications services from within the United Kingdom to wholesale customers that connect to Wire9's network. Its employees all work and reside in the United Kingdom, the Isle of Man, and Spain. It does not maintain any offices in New York, nor any state in the United States, and is not licensed to do business in New York. The company does not have a registered agent for service of process in New York; it has no New York subsidiaries, divisions or affiliates; it has no New York telephone listing or mailing address; it does not advertise or solicit business in New York; it does not have any bank accounts in New York; and it does not have any agents in New York.

6

37.    Defendant Wire9 Telecom, Ltd. has never owned or leased real property located in New York.

38.    Defendant Wire9 Telecom, Ltd. has never transacted business with the Plaintiff in New York or any other jurisdiction.

39.    Defendant Wire9 Telecom, Ltd. has never contracted with Plaintiff anywhere to supply goods or services in New York or any other jurisdiction.

40.    To the extent that Plaintiff's Complaint claims that Defendant Wire9 Telecom, Ltd. committed a tortious act, the company denies it.

41.    Defendant Wire9 Telecom, Ltd. has had no contact with Plaintiff.

42.    Defendant Wire9 Telecom, Ltd. has never done or solicited business in New York, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or services rendered in New York.

43.    Defendant Wire9 Telecom, Ltd. had no reason to foresee any injury to Plaintiff in New York while deriving substantial revenue from interstate or international commerce.

All Of The Claims In The Complaint Directly Relate
To A Contract Between Cloud9 Wholesale and Plaintiff

44.    I am a director of Cloud9 Wholesale. Cloud9 Wholesale is an Isle of Man company with its principal place of business in the Isle of Man.

45.    Defendant Cloud9 Wholesale was never properly served, but received in the United Kingdom a copy of the Complaint on or after July 23, 2009.

46.    Cloud9 Wholesale provides telecommunication services outside of the United States to wholesale customers that set their own tariffs and specify the product features that are sold to the wholesale customers' own mobile telephone end users. Its employees all

7

work and reside in the United Kingdom and the Isle of Man. It does not maintain any offices in New York, nor any state in the United States, and is not licensed to do business in New York. The company does not have a registered agent for service of process in New York; it has no New York subsidiaries, divisions or affiliates; it has no New York telephone listing or mailing address; it does not advertise or solicit business in New York; it does not have any bank accounts in New York; it does not have any agents in New York; and it owns no real property in New York.

47.    Defendant Cloud9 Wholesale is not an agent or mere department of any of the other company or individual Defendants.

48.    Defendant Cloud9 Wholesale's business includes providing to its wholesale customers access to telecommunications technology that is then used by the wholesale customers to define the exact products and services that they sell to their own mobile telephone end users so that cheaper mobile telephone calls can be made while traveling outside of the United States.

49.    Defendant Cloud9 Wholesale does not supply mobile telephone communications services directly to end users, but instead supplies support services and SIM cards specifically branded and produced to the re-sellers' own requirements, who, like Plaintiff, define the exact product features, tariffs, terms and conditions and then supply either mobile telephone end users directly or other re-sellers who always maintain ownership of the relationship with the end user.

50.    Cloud9 Wholesale did not transact business with Plaintiff in New York, or supply any goods or services to Plaintiff in New York.

8

51.    The only business that was transacted between any of the parties here was a Master Services Agreement ("Services Agreement") and Order Form entered into between Plaintiff--a Delaware corporation with a New York place of business--and Cloud9 Wholesale. The Services Agreement and Order Form are attached as Exhibits A and B, respectively, to this Declaration.

52.    On or about May 15, 2007, Plaintiff entered into a contractual relationship with Defendant Cloud9 Wholesale pursuant to the Services Agreement and Order Form.

53.    The Services Agreement and Order Form was negotiated by a separate defendant to the Plaintiff's Complaint, Lee Jones, a former director of Cloud9 Wholesale, and Mark Fletcher who was, upon information and belief, a United Kingdom resident and officer of Plaintiff who was based in the London offices of Plaintiff. Upon information and belief, all negotiations occurred between Mr. Fletcher of Plaintiff and Mr. Jones of Cloud9 Wholesale while both parties were in the United Kingdom and Isle of Man. Upon information and belief, Armand Ventura, also attended meetings in the United Kingdom in connection with the negotiation. Upon information and belief, all communication with Plaintiff by Mr. Jones in connection with the negotiation occurred while Mr. Jones was in the United Kingdom or Isle of Man.

54.    Upon information and belief, the Services Agreement and Order Form were signed by Mr. Fletcher for Plaintiff and Mr. Jones for Defendant Cloud9 Wholesale while they were located in the United Kingdom.

55.    After the Services Agreement was executed, no director, employee or agent of Cloud9 Wholesale, or any of the other company Defendants, visited New York for meetings related to the contractual relationship between Plaintiff and Cloud9 Wholesale.

9

56.   The Services Agreement between Plaintiff and Cloud9 Wholesale provided Plaintiff with access to telecommunications technology that Plaintiff then used to define the exact products and services it sold to its own mobile telephone end users so that cheaper mobile telephone calls could be made while traveling outside of the United States.

57.   Cloud9 Wholesale did not supply mobile telephone communications services directly to Plaintiff's end users, but rather supplied SIM cards with Plaintiff's name and artwork pre-printed, and support services to Plaintiff who defined the exact product features, tariffs, terms and conditions and then supplied its own mobile telephone end users directly or other re-sellers who always maintained ownership of the relationship with the end user. Plaintiff's customers (i.e., the mobile telephone end users) would have no reason to know about Cloud9 Wholesale or any of the other Defendants.

58.   Plaintiff's own packaging specified to its end users that the mobile telephones sold by Plaintiff were intended for use by its end users while they were traveling outside of the United States.

59.   The provision of telecommunication services by Cloud9 Wholesale to Plaintiff occurred in the United Kingdom and Isle of Man where Cloud9 Wholesale's systems are based.

60.   Cloud9 Wholesale supplied SIM cards to Plaintiff in the United Kingdom either to a third party fulfillment house or directly to Plaintiff's United Kingdom offices.

61.   Pursuant to the Order Form, Plaintiff was obligated to pay fixed monthly rental and usage charges to Cloud9 Wholesale. See Ex. B, pp. 7-8.

62.   Cloud9 Wholesale created invoices for these fixed charges in the United Kingdom and/or Isle of Man and sent them to Plaintiff's offices in the United Kingdom.

63.    Plaintiff wired payments to Cloud9 Wholesale's bank account in the United Kingdom or Isle of Man.

64.    Until in or about February, 2009, Plaintiff maintained a branch office in England, including most recently at 1 Liverpool Street, Suite 209, London, but previously at Borough High Street, London.

65.    Pursuant to Section 12.1 of the Services Agreement, the Plaintiff and Defendant Cloud9 Wholesale agreed that English Law would govern the Agreement and the parties would "submit to the exclusive jurisdiction of the English courts." See Ex. A, p. 6.

66.    Earlier this year, the Plaintiff and Defendant Cloud9 Wholesale became involved in a dispute regarding past due invoices for telecommunications services provided to Plaintiff by Defendant Cloud9 Wholesale, which resulted in the termination of the Services Agreement on or about April 24, 2009.

67.    After the dispute could not be resolved between UK counsel for Plaintiff and Defendant Cloud9 Wholesale, on or about April 30, 2009, a claim was filed in the English Courts (the "UK Proceeding") by Defendant Cloud9 Wholesale pursuant to the forum selection clause in the Services Agreement. A copy of the "Particulars of Claim" filed in the UK Proceeding is attached as Exhibit C to the Declaration.

68.    Based on Plaintiff's failure to appear in the UK Proceeding, on July 31, 2009, the English Court ordered that Judgment be entered in favor of Defendant Cloud9 Wholesale in an amount to be decided by the English Court. A copy of the July 31, 2009 Order by the English Court in the UK Proceeding is attached as Exhibit D to the Declaration.

69.    Instead of responding to the claims in the UK Proceeding, Plaintiff has filed this retaliatory action in New York with trumped up charges of misconduct by companies

11

and individuals that Plaintiff did not do business with in order to try and avoid the forum selection clause in the Services Agreement.

70.    All of the claims in Plaintiff's Complaint directly relate to the Services Agreement and Order between Plaintiff and Defendant Cloud9 Wholesale, and thus, are governed by the forum selection clause in the Services Agreement.

71.    Plaintiff raised all of the claims in the Complaint through UK counsel earlier in the year, and Plaintiff has elected not to raise these claims in the UK Proceeding. Accordingly, this Court should not sanction Plaintiff's tactics in attempting to subvert the forum selection clause in the Services Agreement.

The Company Defendants Are Not Mere Shells And Did Not Act As Any Individual's Agent

72.    The Services Agreement between Defendant Cloud9 Wholesale and Plaintiff was entered into to further the company's business and not to advance the purely personal ends of any of the individual Defendants..

73.    All the company defendants (1) observed all corporate formalities; (2) are adequately capitalized; (3) never mingled company and individual finances; and (4) were not dominated by me or any of the other directors or employees for personal business.

74.    None of the corporate Defendants acted as an agent for any of the individual Defendants.

75.    I did not commit any tortious acts in relation to Plaintiff, and Plaintiff's Complaint does not identify any specific tortious acts by me or any other director or employee of the named company Defendants.

76.    I did not exercise control over Cloud9 Wholesale or any of the other company Defendants in connection with the transaction of any business, including the Services

12

Agreement, and it appears that I have been named as a Defendant for the sole reason that I am a Director of the company Defendants.

77.    I am advised by counsel that, under these circumstances, individual liability is not present here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 14, 2009

_____
JEAN CHRISTOPHE VIGUIER

# EXHIBIT A



Master Services Agreement

CLOUD9 MOBILE COMMUNICATIONS (WHOLESALE SERVICES) LTD
22-24 VICTORIA STREET
DOUGLAS
ISLE OF MAN
IM1 2LE
BRITISH ISLES

- and -

Customer:
BlueFire Wireless Inc.
515 Madison Avenue.
Suite 1910.
New York NY
10022.
USA





# PLEAE ENSURE TO ATTACH A VALID INITIAL ORDER & INITIAL EACH PAGE

Updated 28.06.06

**THIS MANAGED SERVICES/SWITCH PARTITIONING AGREEMENT**
Is made upon the terms & conditions set out herein this                    day of                    2006

**BETWEEN**
(a) The customer whose details are set out in this Agreement and on the Order (hereinafter referred to as '**CUSTOMER**'); and
(b) Cloud9 Mobile Communications (Wholesale Services) Ltd whose registered office is at Bourne Councourse, Peel Street, Ramsey, Isle of Man, IMB 1JJ, British Isles (hereinafter referred to as '**Cloud9**')

## SECTION 1 – INTERPRETATION

1          **Interpretation**
1.1.1    The following provisions shall have effect for the interpretation of this Agreement, unless the context requires otherwise.
1.2      **Recital**
1.2.1    CUSTOMER wishes to acquire the various Services as set out in this Agreement and its annexes
1.2.2    Cloud9 is a licensed telecommunications provider/network operator and Internet service provider operating managed telephony; signalling and data services which Cloud9 agrees, subject to an Order, to provide CUSTOMER on the terms and conditions set out in this Agreement and its annexes.
1.3      **Definitions**
1.3.1    Incorporating all those in the relevant Boiler Plate Provisions and the AUP:
"**AUP**"
As set out (and amended from time to time at Cloud9's sole discretion) at http://www.userlogin.info.
"**Customer Care Portal**"
Cloud9's online CUSTOMER care portal located at http://www.userlogin.info.
"**Agreement**"
This Agreement; the Boiler Plate Provisions and Annexe's; the Order and the AUP.
"**Service Provider**"
A customer of the CUSTOMER
"**Service(s)**"
The products and/or managed services specified and priced in Annex C and Annex A respectively which are subject at all times to an Order.  Customer may elect to modify or add new Services at any time subject to submission to Cloud9 of a new Order.  Cloud9 shall only be bound to provide services once it has received and accepted such an Order.
"**Order**"
The order(s) from time to time placed by Customer and accepted thereafter accepted by Cloud9 at Cloud9's absolute and sole discretion as set out in this Agreement.   A Order is not binding on Cloud9 until signed and accepted in writing by Cloud9.
"**Event of Force Majeure**"
Any event beyond the party relying on its reasonable control, including without limitation an act of God, inclement weather, failure or shortage of power supplies or raw material or equipment, flood, draught, lightning or fire, national organised labour disputes (except labour disputes affecting the workforce of the party relying on this clause), the act or omission of Government, highways authorities, failure of other telecommunications operators/suppliers or authorities to provide essential services for the normal operation/provision of any part of this Agreement, war, riot, directives issued by civil or military authorities, court orders, failure of or delay in deliveries effected by vendors or suppliers, or delays in shipment/supply of Services.
"**Charges**"
The prices charged by Cloud9 for the various Services as set out in this Agreement and the annex attached hereto and marked Schedule A.
"**Customers' Services**"
The Services from time to time re-sold or otherwise provided to customer(s); distributor(s) and end user(s) of CUSTOMER (excluding the MVNO HOSTING PACKAGE).
"**Boiler Plate Provisions**"
The additional terms and conditions relating to each type of Service as set out in the annex attached hereto and marked Schedule B.
"**Charge Change Notice**"



A notice served to CUSTOMER of a change in the Charges (including for the avoidance of doubt any change to the Transit Egress Rates (referred to in the Boiler Plate Provisions). Cloud9 reserves the right to serve a Charge Change Notice at any time, and at its sole and absolute discretion and without specific notice period. A Charge Change Notice shall be served electronically at the Customer Care Portal, which shall be notified there from to CUSTOMER by email at CUSTOMERS last known email address.

**"Initial Term"**
The initial term of this Agreement being the period of thirty six months.
**"Renewal Term"**
Successive periods of this Agreement being the period of 12 months.
**"Security"**
The financial security, if required pursuant to an Order, in the form prescribed in Annex D.

## SECTION 2 – CLOUD9'S RESPONSIBILITIES

2.    **Cloud9's Responsibilities**

2.1    Cloud9 shall be responsible for the provision of each Service requested from time to time by Customer and supplied by Cloud9 throughout the term of this Agreement on the terms and conditions of this Agreement, provided Cloud9 has notified CUSTOMER of acceptance of an Order in respect thereof.

2.2    Cloud9 shall provide the Services in accordance with this Agreement and unless a level of service ("SLA") is stated on the Order it is agreed that:

2.2.1   Cloud9 provides no service level agreement and provides the Services strictly on an as is basis and makes no warranty that the Services shall be continuous, free of faults or degradation in quality from time to time; and

2.2.2   CUSTOMER shall not hold Cloud9 liable in any way whatsoever in respect of any Service faults, interruptions or degradation in quality.

2.3    Cloud9 shall, as soon as reasonably possible following its acceptance of an Order, notify CUSTOMER of the date by which it plans to commence Services under the Order. For the avoidance of doubt acceptance of an Order is at Cloud9's absolute and sole discretion and may be rejected at any time.

2.4    Cloud9 shall, where applicable and at its sole discretion, carry out acceptance tests prior to commencement of a Service. If CUSTOMER is required to participate in such tests then CUSTOMER shall adhere to the test guidelines set out by Cloud9. Failure to adhere to any test guidelines may result in delays or failure in provision of service and CUSTOMER holds harmless and indemnifies Cloud9 in respect thereof. Cloud9 shall not be required to provide Services until satisfactory testing has been completed with CUSTOMER (if so required).

2.5    Provision of each Service shall start on the date on which Cloud9 first makes the Service available to CUSOMER (the "Service Commencement Date") and Cloud9's responsibility to provide the Service to CUSTOMER shall not exist until after the Service Commencement Date.

2.6    Cloud9 will provide the Service (or such other services as agreed in an Order) with reasonable skill and care and in all cases as soon as reasonably practical. Save for where a specific time period is provided for in this Agreement and an agreed Order, time shall not be of the essence of this agreement.

## SECTION 3 – CUSTOMER'S RESPONSIBILITIES

3    **CUSTOMER's Responsibilities**

3.1    CUSTOMER shall be responsible for using the Services and making prompt payments to Cloud9 throughout the term of this Agreement on the terms and conditions set out in this Agreement.

3.2    CUSTOMER shall ensure that it complies at all times with all laws, directives and regulations which are applicable to the CUSTOMER's use of the Services. CUSTOMER shall also obtain any relevant consents and approvals for the installation and use of the Services ("the Consents").

3.3    Cloud9 shall have no liability under this Agreement for failure to comply with its obligations in any case where CUSTOMER does not comply with any such laws, directives or regulations or does not obtain such Consents or approvals and if Cloud9 incurs any costs or sustains any damages of any kind, either in connection with a liability to a person or in any other way, arising out of any such omission by CUSTOMER then CUSTOMER shall promptly reimburse such amounts to Cloud9.

3.4    CUSTOMER shall use the Services in accordance with any reasonable operating instructions Cloud9 may provide.

3.5    CUSTOMER shall be responsible for all Charges incurred in connection with any use of the Services, whether or not it has authorised such use and if Cloud9 incurs any costs, either in connection with a liability to a person or in any other way, arising out of any such access or use then CUSTOMER shall immediately reimburse such amounts to Cloud9.

3.6    If Cloud9 provides CUSTOMER with any equipment which is owned by Cloud9 or by a third party ("Equipment"), the Equipment shall remain the property of Cloud9 or the third party at all times and shall be kept at the relevant site and used in accordance with Cloud9' instructions.

3.7    CUSTOMER shall not deal with, modify or interfere with the Equipment or remove or alter any
       identification mark on the Equipment showing that it is owned by Cloud9 or a third party and shall not let
       any other third party have rights over the Equipment.

3.8    CUSTOMER shall notify Cloud9 immediately of any loss of or damage to the Equipment and the Service
       Provider shall be liable to Cloud9 for any such loss or damage while it is in CUSTOMER's custody.

3.9    CUSTOMER shall permit Cloud9 to inspect or test the Equipment remotely at times specified by Cloud9.

3.10   CUSTOMER shall keep any Equipment fully insured against all risks to the value specified from time to
       time by Cloud9 and on request immediately evidence the same to Cloud9 (and where appropriate endorse
       Cloud9's interest on any such policy).

## SECTION 4 – TERM AND TERMINATION

### 4    Term and Termination

4.1    Unless varied from time to time in an Order or terminated pursuant to the clauses of this Agreement,
       this Agreement will take effect for the Initial Term and will thereinafter be prolonged automatically by
       successive periods of the Renewal Term (jointly the "Term") unless it is terminated by either party
       giving to the other party a minimum of three months written notice to be served before the
       commencement of the next Term (the "Notice").

4.2    Any additional Services from time to time ordered and provided under this Agreement shall be subject
       to Notice and provided for the remainder of the current Term as if provided at the commencement of
       this Agreement.

4.3    Either party may terminate or suspend this Agreement or any Service provided hereunder at any time
       by giving notice to the other where either party has committed a breach of this agreement and fails to
       remedy such breach within one (1) months of receipt of notice requiring it to do so.

4.4    Termination, suspension, or expiry of this Agreement for any reason shall be without prejudice to each
       of the party's respective rights and obligations accruing up to and including the date of such
       termination, suspension or expiry.

4.5    On termination of this Agreement, for any reason whatsoever save as set out in this Agreement, each
       of the parties shall immediately return to the other property such of the other party's intellectual
       property and property in its custody or control.

## SECTION 5 – RATES AND PAYMENT

### 5    Rates and Payment

5.1    Each party shall promptly make the payments required to the other party as follows:

5.1.1  Payment of install and set up Charges are payable in advance of Service activation; and

5.1.2  All recurring Charges are payable quarterly in advance; and

5.1.3  All usage based Charges payable monthly on presentation of an electronic invoice at the Customer Care
       Portal (or as otherwise set in an Order). Cloud9 will notify CUSTOMER of new invoices via email.

5.2    All Charges stated are exclusive of any sales or value added tax or other duties that Cloud9 may from
       time to time be required to charge CUSTOMER which CUSTOMER shall pay in addition to the Charges.
       CUSTOMER shall on demand provide Security to Cloud9 at a level from time to time prescribed by
       Cloud9 to cover the minimum duration of this Agreement and any Order(s) from time to time subject
       thereto.

5.3    prescribed from time to time by Cloud9 to cover the Charges in the format prescribed at Customer Care
       Portal. In the event CUSTOMER's account becomes past due, Cloud9 may, in its sole discretion,
       suspend or disconnect the Services without further reference to CUSTOMER. In the event of such
       suspension or disconnection, Cloud9 may place restrictions on a LOC, deposit or such other security in
       order for CUSTOMER to resume receiving the Services. Failure to satisfy Cloud9's request for such
       action within timelines set by Cloud9 may result in immediate termination of the Services without
       further notice. CUSTOMER may not withhold or set off any payment for any reason without Cloud9's
       prior written consent. Cloud9 reserves the right to net-off in the event of non-payment by CUSTOMER.

5.4    Cloud9 shall not be liable for any loss or damages caused by its suspension or disconnection of any and
       all Services in accordance with this Agreement. In the event of non-payment by CUSTOMER, Cloud9
       may restrict access to equipment provided by CUSTOMER and co-located at Cloud9's facilities and
       furthermore assert a lien on CUSTOMER equipment; property of funds and at its absolute and sole
       discretion dispose thereof at a reasonable market rate and apply such proceeds to settle CUSTOMER's
       account. Where Cloud9 exercises its rights under this clause it shall delete any data or programs on
       CUSTOMERS equipment before its disposal, and shall have no obligation to back up CUSTOMERS data
       prior thereto.

5.5    CUSTOMER acknowledges that a Charge Change Notice may be served at any time and may also affect
       existing as well as any new services provided to CUSTOMER. CUSTOMER acknowledges that continued
       use the Services the subject of and following a Charge Change Notification is confirmation to Cloud9
       that CUSTOMER accepts such Charge Change Notification. CUSTOMER shall check the effect of each



and every Charge Change Notification via the Customer Care Portal. Save as for Charges in relation to telephony call rates, in the event that the Charges made by one party to the other increase by more than ten percent (10%) in any 12 month period then the either party may elect to terminate this Agreement with one (1) months written notice.

## SECTION 6 – ENTIRE AGREEMENT

### 6 Entire Agreement

6.1 The Agreement; the Orders; the AUP; the Boiler Plate Provisions and annexes referred to therein attached hereto represents the entire understanding between the parties relation to the subject matter hereof and supersedes all prior agreements, representations or understandings by either party whether oral or written.

6.2 Each of the parties acknowledges that in agreeing to enter into this Agreement it has not relied on any representation, warranty, collateral agreement, arrangement or understanding (whether negligently or innocently made) of any person (whether party to this agreement or not) other than expressly set out in this Agreement and any agreed Order(s) and the parties agree to waive all rights and remedies, which, but for this clause might be available to it in respect of such representation, warranty, collateral agreement, arrangement or understanding, provided that nothing in this clause shall limit or exclude any liability for fraudulent misrepresentation.

6.3 All previous Agreements with regard to the subject matter hereof are cancelled at the date of execution of this Agreement.

## SECTION 7 – NO WAIVER

### 7 No Waiver

7.1 Failure by either party to exercise or enforce any right conferred by the Agreement shall not be deemed to be a waiver of any such right nor oppose so as to bar the exercise or enforcement thereof or any other right on any later occasion.

## SECTION 8 – NOTICES

### 8 Notices

8.1 Any notice, invoice or other document which may be given under the terms of this Agreement shall be deemed to have been duly given if delivered electronically and/or notified at the Customer Care Portal and/or left at or sent by post to the usual or last place of business of the recipient party.

## SECTION 9 – FORCE MAJEURE

### 9 Force Majeure

9.1 Neither party shall be held to be in breach of its obligations under the Agreement or liable to the other party whatsoever (save for obligations to make payments under the Agreement) nor liable to the other party for any losses or damages (without limitation direct, indirect and/or consequential) which may be suffered by the other party due to any case beyond the reasonable control of the first party in the Event of Force Majeure.

9.2 Either party may terminate this Agreement (without penalty or damages of any kind whatsoever) in the event that an event of Force Majeure extends beyond one whole calendar month.

## SECTION 10 – INTELLECTUAL PROPERTY RIGHTS

### 10 Intellectual Property Rights

10.1 The parties respective Intellectual Property Rights shall remain the property of whichever creates or owns the same and nothing in this Agreement shall be deemed to confer any assignment or licence of the Intellectual Property Rights of the other party, save that the Intellectual Property Rights or goodwill in the Numbers and IMSI's shall hereby remain be vested in Cloud9 at all times.

10.2 CUSTOMER represents and warrants that CUSTOMER's use of the Services shall not infringe the intellectual property or other proprietary rights of Cloud9 or any third party. CUSTOMER further acknowledges that all right, title and interest in any and all technology, including the software that is part of or provided with the Services and any trademarks or service marks of Cloud9 (collectively, "Cloud9 Intellectual Property") is vested in Cloud9 and/or in Cloud9's licensors. Unless otherwise specifically provided in this Agreement, CUSTOMER shall have no right, title, claims or interest in or to the Cloud9 Intellectual Property. CUSTOMER may not copy, modify or translate the Cloud9 Intellectual



Property or related documentation, or decompile, disassemble or reverse engineer the Cloud9 Intellectual Property, or use the Cloud9 Intellectual Property other than in connection with the Services, or grant any other person or entity the right to do any of the foregoing. Unless otherwise specifically provided in this Agreement, CUSTOMER is not authorized to distribute or to authorize others to distribute the Cloud9 Intellectual Property in any manner without the prior written consent of Cloud9; provided, however, that nothing in this sentence shall preclude CUSTOMER from using the Cloud9 Intellectual Property to the extent (i) incorporated into the Services and (ii) necessary for CUSTOMER to utilize the full functionality of the Services purchased.

## SECTION 11 – CONFIDENTIALLITY

11    **Confidentiality**

In consideration of the mutual exchange and disclosure of each party's confidential information, each party undertakes in relation to the other party's confidential information:

11.1    to maintain the same in confidence and in particular, but without prejudice to the generality of the foregoing, not to make any commercial use thereof or use the same for the benefit of itself or any third party other than pursuant to a further agreement with the other party;

11.2    not to copy reproduce or reduce to writing any part thereof except as may be reasonably necessary to give effect to this Agreement and that any copies reproductions or reductions to writing so made shall be the property of the disclosing party;

11.3    not to disclose the same whether to its employees or to third parties except in confidence to such of its employees, directors and professional advisers or those of any company in the same Group of Companies who need to know the same and that (i) such employees, directors and advisers are obliged by their contracts with the receiving party not to disclose the same, and (ii) the receiving party shall enforce such obligations and its expense and at the request of the disclosing party in so far as breach of such obligations relates to the disclosing party's confidential information;

11.4    to be responsible for the performance of sub-clauses (11.1), (11.2) and (11.3) above on the part of the employees, directors or advisers to whom the confidential information is disclosed pursuant to sub-clause (11.3) above;

11.5    to apply to the other party's confidential information no lesser security measures and degree of care than those which the receiving party applies to its own confidential or proprietary information. Notwithstanding the foregoing, and notwithstanding the provisions contained in this clause 11 and its sub-clauses the receiving Party shall be entitled to make any disclosure required by law or the requirements of any recognised Stock Exchange provided that it notifies the other Party prior to making such disclosures;

11.6    not, whilst in possession of the other party's confidential information, to deal directly or indirectly in the other party's shares not to procure that any other person or persons may do so nor to influence any person in any decision as to whether to deal in the other party's shares.

## SECTION 12 – GOVERNING LAW

12    **Governing Law**

12.1    The Agreement shall be governed by, construed, and interpreted in accordance with English Law and parties hereby submit to the exclusive jurisdiction of the English courts.

## SECTION 13 – LIMITATION OF LIABILITY

13    **Liability**

13.1    Neither party shall have any liability to the other under this Agreement except as expressly set out herein, whether in contract, tort (including negligence) or otherwise, including, without limitation, for any loss of revenue, business, goodwill, data, computer programs, contracts, anticipated savings or profits even if the other party was aware, or should have been aware of such possibility.

13.2    Nothing in this Agreement shall exclude or restrict either party's liability for death or personal injury resulting from its negligence.

13.3    Subject to the terms of the SLA as set out in clause 2.2, service level credits ("Service Credits") as set out in the Order shall, if applicable, be the CUSTOMER's exclusive remedy against Cloud9 in respect of any and all failures in Service performance even where Cloud9 is made aware of the likely loss incurred by CUSTOMER for such failure.

13.4    Cloud9 shall not be liable for any failure of the Services to meet the specified SLA to the extent that such failure is due to any action; fault; error and or omission by/of CUSTOMER and/or CUSTOMERS equipment or is otherwise due to required access to the Services and/or CUSTOMERS equipment not being granted; is a direct result of any interruptions or maintenance activities notified to CUSTOMER or pursuant to any event of Force Majeure or where the failure is outside of Cloud9's network.







## SECTION 14 – ASSIGMENT

14    Assignment
14.1    Neither party may not assign or otherwise transfer or dispose any of its rights or obligations without the previous written consent of the other party, not to be unreasonably withheld.

## SECTION 15 – GENERAL

15.1    Each party warrants that they are authorised to enter into this Agreement.
15.2    This Agreement may not be varied unless such variation is in writing and signed by the authorised signatories of both parties with reference to this Agreement.
15.4    A person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement provided that this shall not affect any right or remedy which exists or is available apart from that Act.
15.5    In addition to the terms and conditions set out above, the Boiler Plate Provisions; the Order and the AUP shall also apply.  If there is any conflict between the provisions thereof then the order of precedence between the different parts of this Agreement and its constitute parts shall be: (i) the Order; (ii) the Boiler Plate Provisions (including Annexe's); (iii) this main body Agreement; (iv) the AUP.

### DULY AUTHORISED SIGNATORY OF CUSTOME:

Signed

Print Name        M.ri Fletcher

Position        DIRECTOR

Duly authorised for and behalf of

Print Customer's full legal name and address: (then countersign each and every page and annex of Agreement)

Bluefire Wireless Inc
515 Madison Ave
Suite 1910
New York NY
10022 USA

### DULY AUTHORISED SIGNATORY OF CLOUD9:

Signed

Print Name

Position        Authoirised Signatory

Duly authorised for and behalf of

CLOUD9 MOBILE COMMUNICATIONS (WHOLESALE SERVICES) LTD
BOURNE COUNCOURSE
PEEL STREET
RAMSEY
ISLE OF MAN
IM8 1JJ
BRITISH ISLES

Annex A

Charges

The Charges shall incorporate the following prices, which are payable quarterly in advance and require one quarter's rental paid in advance as security deposit (save as for usage Charges which shall be charged monthly):

**MANAGED SWITCHING PARTITION SERVICES**
[only those services selected on ORDER FORM applicable]

| Volume : | 1-4 | 5-8 | 9-12 | 13+ |
|---|---|---|---|---|
| | **Monthly Recurring Charges:** | | | |
| **(1) HOSTED BT INTERCONNECT (CUSOMERS OWN VIRTUAL PSTN CONNECT)** [CUSTOMER retains 100% NTS & PRS revenue – excludes DDI/PSTN & Mobile] [CUSTOMER may use CLOUD9 or its own Ofcom allocated number ranges] In selecting this option CUSTOMER will share transmission capacity in place Between Cloud9 and BT and therefore Cloud9 does not guarantee capacity | 1,500 | 1,200 | 1,000 | 800 |
| **(2) HOSTED BT INTERCONNECT (CUSOMERS OWN VIRTUAL PSTN CONNECT)** [CUSTOMER retains 100% NTS & PRS revenue – excludes DDI/PSTN & Mobile] [CUSTOMER may use CLOUD9 or its own Ofcom allocated number ranges] In selecting this option CLOUD9 will provision dedicated transmission to BT via CLOUD9's interconnect on behalf of CUSTOMER so capacity is guaranteed | 1,800 | 1,500 | 1,300 | 1,000 |
| **(3) HOSTED PRIVATE INTERCONNECT (TDM)** Customer specific E1 TDM private interconnect circuits | 1,200 | 1,000 | 800 | 600 |
| **(4) HOSTED PRIVATE VOIP INTERCONNECT (GW BASED)** Customer specific virtual E1 (30 channel) private interconnect circuits | 600 | 500 | 400 | 300 |
| **(5) MANAGED RETAIL VOIP SOLUTION (GK BASED)** This allows CUSTOMER to offer a 'Skype-like' private label VoIP retail service NB: this is for single users with credit card pre-pay for PSTN DDI based origination and termination (and free on-net calls) | 1,500 per month (unlimited end users) | | | |
| **(6) MANAGED VIRTUAL PBX SOLUTION (GK BASED)** This allows CUSTOMER to offer a 'Skype-like' private label VoIP retail service NB: this is a B2B/Corporate virtual PBX core-network service with multiple business users and fully functional soft-hosted PBX solution for PSTN DDI based origination and termination (and free on-net calls) | 500 per site/instance month | | | |
| **(7) MANAGED PBX VOIP INTERCONNECT SOLUTION (GK BASED)** This allows CUSTOMER to offer a 'Skype-like' private label VoIP retail service NB: this is for connection of VOIP enabled PBX's to Cloud9 network for PSTN DDI based origination and termination (and free on-net calls) | 10 per channel per month | | | |
| **(8) MANAGED CALLING CARD SOLUTION** This allows CUSTOMER to offer a private label calling card retail service | 750 per month | | | |
| **(9) MONTHLY 'PARTITIONED MOBILE NETWORK' PLATFORM RENTAL** THIS IS PARTITION ON COMPLETE CORE NETWORK AS DESCRIBED IN ORDER This allows CUSTOMER to offer a private label virtual mobile retail & roaming service NB: This may require other service detailed herein to give full functionality | 14,800 per month (base platform Charge) | | | |
| **(10) MONTHLY 'DUAL-IMSI ONLY' ROAMING PLATFORM RENTAL** THIS INCLUDES DUAL-IMSI INTERNATIONAL IN AND OUT-ROAMING NB: this is not taken with (9) and is only available to GSMA member MNO's | 7,800 per month | | | |
| | **Non-Recurring Charges:** | | | |
| **(11) SS7 LINK-SET (install charge) – TDM TRAFFIC BEARERS** | 2,000 | (all) | | |
| **(12) SIGNALLING SERVICE** NB: this Charge also applies where exposing SS7 & USSD over other protocols NB: CLOUD9 implements Sigtran only for SS7 interworking but can expose SS7 to CUSTOMER as HTTP or other agreed private protocol | 2,000 | (all) | | |
| **(13) E1 CIRCUITS** [excl cabling & sundries at cost] NB: it is CUSTOMERS responsibility to provide all tails | 990 | (all) | | |
| **(14) VOIP E1 CIRCUITS** | 495 | (all) | | |
| **(15) MANAGED RETAIL VOIP GATEWAY SOLUTION** | 1,500 | | | |

(9)

| | |
|---|---|
| **(16) MANAGED CALLING CARD SOLUTION** | 750 |
| **(17) BASIC ONLINE CDR's & REPORTS & INTELLIGENT NETWORK** | Included (Customer Care Portal) |
| **(17) MANAGED INTERCONNECT & CUSTOMER BILLING** | included (Customer Care Portal) |
| **(18) MONTHLY 'PARTITIONED MOBILE NETWORK' PLATFORM RENTAL** <br> *NB: this service includes basis Dual-IMSI OUT-Roaming but Excludes IN-Roaming which requires additional option 18* | 18,000 |
| **(19) DUAL-IMSI ROAMING ONLY - PLATFORM SET UP** <br> *NB: this is full IN and OUT-Roaming, primarily aimed at fully licensed Spectrum holding operators requiring extending their roaming coverage* | 18,000 (Strictly on application) |

**Usage Charges:**

| | |
|---|---|
| **(20) SIGNALLING SERVICE (charged on every MSU)** <br> *NB: this applies to all SS7 signalling entering and/or leaving the CLOUD9 system to both CUSTOMER and the International SS7 network* <br> COMPULSORY WITH (18) AND (19) | 0.004 per MSU/packet (sent and received) |
| **(21) USSD SIGNALLING SERVICE (charged on every USSD MSU)** <br> *NB: this additional premium applies to all SS7 signalling entering and/or leaving the CLOUD9 system to both CUSTOMER and the International SS7 network* <br> COMPULSORY WITH (18) AND (19) | 0.009 per MSU/packet (sent and received) |
| **(22) MVNO MANAGED BILLING** <br> *NB: CDR's are recorded for all transactions (even if NULL duration/service) including SMS traffic* <br> COMPULSORY WITH (18) AND (19) | 0.003 per CDR |
| **(23) MVNO IMSI CHARGES** <br> *NB: Dual-IMSI Roaming will require an additional IMSI per Subscriber* <br> COMPULSORY WITH (18) AND (19) | 2.00 per IMSI (minimum 10K blocks) |
| **(24) NETWORK USAGE CHARGES - always applicable to (9) and (10)** <br> COMPULSORY WITH (18) AND (19) <br> *NB: Less any applicable IOT Discount specified on an Order* | Published IOT +8% (marked-up IOT TAPIN's) |
| **(25) SMS (MT)** <br> COMPULSORY WITH (18) AND (19) | As per Order (plus IOT rate if applicable) |
| **(26) SMS (MO)** <br> COMPULSORY WITH (18) AND (19) | As per Order (plus IOT rate if applicable) |
| **(27) BEARER/CALL ROUTING** <br> (charged on all Ingress to the Cloud9 system) | As per Order |
| **(28) ACTIVE CALL RECORDING** <br> (A; B or A&B leg of calls transiting Cloud9 system only) | 0.35 ppm |
| **(29) CALL TRANSLATION /TERMINATION (to SIP phone – not trunk)** | 0.5 ppm |
| **(30) CALL TRANSLATION /TERMINATION (ON NET DIALIP/CVX)** | 1.0 ppm (N/A on a paid partition‡) |
| **(31) CALL TRANSLATION /TERMINATION (Call-Thru)** | 1.25 ppm |
| **(32) CALL TRANSLATION /TERMINATION (VOICEMAIL)** | FREE |
| **(33) CALL TRANSLATION /TERMINATION (ON NET IVR)** | 2.0 ppm (basic script & own wav's) |
| **(34) CALL TRANSLATION /TERMINATION (ON NET COMPLEX IVR)** | subject to specification & quotation |
| **(35) TRANSIT EGRESS/NTS (via BT/Cloud9 transit carriers)** <br> (cost for routing off-net to a dialled number via the Cloud9 system) <br> *NB: these are Cloud9's variable wholesale rates are published and updated electronically at the Customer Care Portal. These are subject to change at Cloud9's discretion subject to a Charge Change notice* | as published (variable) on the Portal |

**Other Charges:**

| | |
|---|---|
| **(36) OTHER** | As per Order (NOTES) |
| **(37) MANAGED GSM 1800 BASE STATIONS & RF EQUIPMENT** | subject to specification & quotation |



| (38) INTERACTIVE 3G VIDEO CONFERENCING GATEWAY | subject to specification & quotation |
| (39) PAYMENT PROCESSING | 5% (plus Barclays Bank charges to Cloud9) |
| (40) IP TRANSIT (using Cloud9 APN, in addition to IOT/mark-up) | 95.00 per Mbps (95th Percentile) |

**MANAGED IP SERVICES (applicable only if selected on ORDER FORM)**

|  | **Monthly Recurring Charges:** |
|---|---|
| (41) MANAGED COLOCATION | 500 per ¼ rack or 75 per U /month |
| (42) MANAGED IP TRANSIT | £90 per Mbps per month (95th Percentile) |
| (43) MANAGED FIREWALL | £350 per month |
| (44) IP ADDRESSES | £10 per IP (sub netted on request) |
| (45) MANAGED STREAMING/CONTENT DELIVERY (HTTP/RTP/MMS) | £1 per Gigabyte /month |
| (46) LIVE PUBLISHING POINT RENTAL | £150 per Publishing Point /month |
| (47) DIGITAL RIGHTS MANAGEMENT CONTROLLER | £150 per Publishing Point /month |
| (48) VIDEO ON DEMAND STORAGE | £100 per Gb /month |

**POINT TO POINT LINKS/IPLC/VPN**

*NB: all point to point Private Leased Circuit ("PLC's") are, unless agreed to the contrary customer to network interconnects ("CSI"). Network to network interconnects ("NNI") is available on request, as is protection.*

| (49) SDH | subject to specification & quotation |
| (50) ATM | subject to specification & quotation |
| (51) IP/MPLS VPN | subject to specification & quotation |

**REMOTE HANDS/DEVELOPMENT/ACCESS/CONSULTANCY AND UN-SPECIFIED SERVICES (always applicable)**

**STANDARD HOURLY RATE** (all services listed and otherwise)        125.00 per hour /part thereof
*NB: this is Cloud9's standard hourly rate for all work not specifically covered or
priced under this Agreement. For the avoidance of doubt, any work carried out
at the request of Customer is priced at the Standard Hourly Rate. This includes
providing advice; consultancy; development of services or the processing of new
Service Providers/end users of Customers onto Cloud9's systems on behalf of
CUSTOMER from time to time (and also includes configuring and testing circuits
for CUSTOMER and its Service Providers/end users).*






Annex B

**Boiler Plate Provisions**

## SECTION (1)

**Additional Terms & Conditions**

Additional Terms & Conditions applicable to this service (if selected).

### DEFINITIONS APPLICABLE TO THIS SECTION

| | |
|---|---|
| "Code" | The current code of practise relevant to Services issued by ICSTIS. |
| "ICSTIS" | The Independent Committee for the Supervision of Standards of Telephone Customers' Services or any other independent body approved for the supervision of telephone Customers' Services recognised by the Director General of Telecommunications (or his representative) as the appropriate body to administer and apply the Code. |
| "AIT" | The artificial inflation of traffic in any way whatsoever |
| "Customers Services" | The services offered via the Switch Partition; the Numbers/Allocated Numbers by the person, firm or body corporate providing the end user information based or content service to callers |
| "Intellectual Property Rights" | Any patent, registered design, registered trade or service mark, copyright, design right, semiconductor topography right, know-how or any similar right exercisable in any part of the world including any application therefore. |
| "Act" | Means the Telecommunication Act 1984 and includes any amendments to the act that may be made from time to time. |
| "Switch Partition" | A logical and/or virtual switching capacity on Cloud9's UK mobile and/or fixed switches belonging and/or operated by Cloud9 enabling CUSTOMER to add and remove CUSTOMER's and control CUSTOMER routing within the scope of Cloud9's technical abilities form time to time. Selected by CUSTOMER as appropriate on the Order. |
| "Interconnect POLO" | The from time to time current revenue share payments due to Cloud9 from British Telecommunications PLC or any other provider of network services that Cloud9 relies on in respect of the Numbers and/or the Allocated Numbers. |
| "Numbers" | Telephone number(s) from time to time issued/ported to CUSTOMER by Cloud9 at Cloud9's sole discretion (including Premium Rate Numbers; Non-Geographic; Geographic Numbers; Mobile and Personal Numbers) |
| "Allocated Numbers" | Similar to Numbers but allocated directly to CUSTOMER by Ofcom or other foreign regulatory authority/agency. |
| "Payment" | The revenue share payments due to CUSTOMER comprising of the gross Interconnect POLO received in cleared funds by Cloud9 less any and all Charges or other amounts falling due to Cloud9 under this Agreement. |
| "Transit Egress" | The additional fee payable (at the rate per minute set out from time to time on the Customer Care Centre) by CUSTOMER to Cloud9 in respect of the onward interconnect/ conveyance/porting/tromboning of calls off-net as specified on the Portal Service. |
| "Transit Ingress" | The charges levied by British Telecommunications PLC or any other provider of network services to ingress calls to the Numbers and/or the Allocated Numbers to Cloud9 |
| "Number Translation Charge" | The charges levied Cloud9 for number translation services. |
| "Regulatory Charge" | The charges required to be paid by Cloud9 (whether directly and/or on behalf of CUSTOMER) to any Government Regulatory Body including (without limitation) ICSTIS in the UK |
| "IP Addresses" | IP addresses which are provided to CUSTOMER by Cloud9 and at Cloud9's sole discretion registered with RIPE as assigned to CUSTOMER |
| "Call Statistics" | The Call Detail Records ("CDR's") and mobile TAP files in relation to all calls to the Numbers and Allocated Numbers. |
| "Property" | All property belonging to either party (intellectual or otherwise and including without limitation information and data relating to the each parties CUSTOMER's, users, suppliers and other such information available and/or stored either party in relation thereto). |
| "CVX" | The switching equipment incorporating modems enabling calls to be routed to public internet. |
| "Service Provider" | Shall mean a customer of CUSTOMER. |
| "Roaming" | The ability for CUSTOMERS' end users to make calls; send and receive SMS; access data services on other mobile networks using Cloud9's systems on a post and pre-pay basis. |



| "GPRS" | General Packet Radio System – the term for internet access on 2G networks. |
|---|---|
| "3G" | Third generation mobile phone system. |
| "Camel" | Pre-pay IN (Intelligent Network) system to authorise CUSTOMERS callers ability to make and receive calls; send SMS and access GPRS and 3G services when Roaming. |
| "IMSI" | The International Mobile Station Identity allocated by Cloud9 to CUSTOMER. |
| "SIM" | Subscriber Identity Module (smart card) containing the telephone number of CUSTOMERS end user; encoded network identification details; PIN and the required IMSI's (including a dual IMSI from Cloud9's network roaming partner). |
| "Signalling service" | Shall mean signalling system number seven and/or the RADIUS protocol and method used for out-of-band signalling between CUSTOMER and Cloud9 system (if appropriate) supporting GSM MAP (for subscriber mobility management); Camel (for prepaid subscriber support) protocols and INAP (Intelligent Network Application Part for advanced service processing). |
| "RADIUS" | Remote Authentication Dial In User Service – the protocol and method used for out-of-band signalling between CUSTOMER and Cloud9 system (if appropriate). |
| "HLR" | Home Location Register. |
| "VLR" | Visitor Location Register. |
| "MSC" | The Mobile Switching Centre of CUSTOMER (if appropriate this is partitioned on Cloud9's network). |
| "Roaming Revenues" | The revenues generated and billed by CUSTOMER to its end users using Cloud9 system whilst roaming. |
| "Permitted Networks" | The networks that CUSTOMERS end users may Roam into. |
| "Bilaterals" | Direct Roaming agreements between CUSTOMER and other mobile operators. |
| "GTT" | Global Title Translation – generally performed by Cloud9. |
| "Revenues" | The revenue generated by CUSTOMER using the Services. |
| "IOT-Tariff" | The uplift rate to be applied to the Permitted Networks IOT rates for use when Roaming. Cloud9 will publish the respective IOT at the Customer Care Portal. |
| "MVNO" | Mobile Virtual Network Operator. |
| "USSD" | Universal Supplemental Data Service |
| "HTTP" | Hyper Text Transfer Protocol |

## SECTION 1 – CLOUD9'S RESPONSIBILITIES

1.      Cloud9's Responsibilities

1.2     Cloud9 shall provide CUSTOMER with the Services as described in an Order.

1.3     Where appropriate to an Order, Cloud9 shall provide the Numbers to CUSTOMER as reasonably requested by CUSTOMER from time to time and route them through Cloud9's network save that Cloud9 shall not be obliged to issue the same where CUSTOMER has not exhausted any previous allocation(s) and in addition CUSTOMER acknowledges the requisite lead time in provisioning new number ranges not already data filled on Cloud9's network

1.4     Where appropriate to an Order, Cloud9 shall provide IMSI's at the request of CUSTOMER. For the avoidance of doubt no property or title in the IMSI's passes to CUSTOMER. CUSTOMER only obtains a right to use the IMSI's for the duration of this Agreement, in so far as Cloud9 is capable of providing the same in collaboration with any underlying suppliers. Cloud9 may, at its absolute and sole discretion and without penalty or right to any refund accruing to CUSTOMER:

1.4.1   substitute IMSI's where it is unavoidable due to change in underlying supplier or due to technical reasons required by Cloud9 to ensure continuance of the Service;

1.4.2   withdraw any IMSI's in the event of any breach, or threatened breach of this Agreement.

1.4.3   withdraw any IMSI's where it is legally required to do so by any underlying supplier or competent authority.

1.5     Cloud9 shall, within the scope of its technical abilities from time to time, use it best endeavours to enable CUSTOMER to route the Numbers/Allocated Numbers as required by CUSTOMER from time to time through the Switch Partition and also enable CUSTOMER to directly add and remove CUSTOMER's and their IMSI's and edit the profile thereof

1.6     Cloud9 does not warrant that the Services (including without limitation the Switch Partition) are or shall be continuous or that they are, or will be, free from faults, however, Cloud9 will take all reasonable precautions and possible steps to ensure that the Switch Partition are continuous and free from faults as far as is reasonably possible

1.7     Where appropriate Cloud9 will use either static and/or dynamic host control protocol to assign temporary IP Addresses to each data call/GPRS and/or 3G data session at its absolute and sole discretion

1.8     Where appropriate Cloud9 will authenticate CUSTOMERS on-net via HTTP if SS7 interconnectivity is not available; in the alternative RADIUS will be used. For off-net authentication to CUSTOMER it is CUSTOMERS obligation to operate and support its own HLR and HTTP;SS7;RADIUS or HTTP signalling as agreed with CLOUD9 from time to time it shall be subject to Cloud9 specifications. If CUSTOMER requires Cloud9 to provide protocol translation or integration to CUSTOMERS equipment/network then CUSTOMER acknowledges that this may require custom development at Cloud9's Standard Hourly Rate within the timescales specified by Cloud9. SS7; SMPP and USSD is supported as standard.

1.9     Where appropriate  Cloud9 will provide CUSTOMER with online CDR'S; provide CDR and TAP file splitting (as appropriate); Accounting and Invoicing which for MVNO's shall also include





1.9.1    Call reports
1.9.2    Fraud Reports
1.9.3    Liaison with Permitted Networks
1.9.4    Submitting and reconciling Invoices to and from CUSTOMER
1.9.5    Full clearing service (netted one monthly)
1.10    Where appropriate Cloud9 will provide (in such a manner from time to time agreed between the parties) online daily call statistics from the relevant Cloud9 logs. These may be unrated and are for guidance purposes until formally rated at month end.
1.11    Cloud9 will publish at the Customer Care Portal a list of Permitted Networks.

## SECTION 2 – CUSTOMER'S RESPONSIBILITIES

2    CUSTOMER's Responsibilities

2.1    CUSTOMER shall use the Services (including without limitation the Switch Partition; the Numbers and the Allocated Numbers; IMSI's; SIMS) strictly as set out in this Agreement and pursuant to the AUP.

2.6    CUSTOMER shall:

    2.6.1    be responsible for the quality and delivery of Customers' Services and ensure that these services shall comply with the Act, the Code and this Agreement;

    2.6.2    be responsible for all its own actions and those of Service Providers and end users/subscribers and hold harmless and indemnify Cloud9 in respect thereof (including without limitation legal costs and disbursements). This sub-clause shall survive termination of this Agreement without limitation to point of reference in time.

    2.6.3    obtain all necessary approvals, permissions or authorizations for the use of the Numbers; the Allocated Numbers; IMSI's and SIM's. CUSTOMER shall neither acquire any right, title or interest in the Numbers; the Allocated Numbers; IMSI's or the SIM's

    2.6.4    provide Cloud9 with such information or material relating to the Customers' Service as may be requested including without limitation copies of recorded messages and any other information supplied to callers/end users;

    2.6.5    ensure that the Services neither infringe any Intellectual Property Rights nor are defamatory;

    2.6.6    liaise with Cloud9 in relation to any complaints, enquiries, or any investigation by callers, the media, ICSTIS or the Director General of Telecommunications (or other such international authorities) relating to the Customers' Services;

    2.6.7    shall neither state nor imply any approval of the services by Cloud9 and shall not use words, names, or expressions which in any way connect Cloud9 to the Customers' Services.

## SECTION 3 – RATES AND PAYMENT

3    Rates and Payment

3.1    Cloud9 will remit Payments to CUSTOMER once the Interconnect POLO has been received in cleared funds by Cloud9. For the avoidance of doubt, Cloud9 shall be under no obligation whatsoever to remit any Payments to CUSTOMER that Cloud9 is not capable of collection (for any reasons whatsoever), and CUSTOMER acknowledges that it is Cloud9's absolute and sole discretion whether to pursue collection of Interconnect POLO's if in Cloud9's opinion they become a bad debt. CUSTOMER will hold harmless; indemnify and keep indemnified Cloud9 in respect of any and all charges; costs (without limitation legal costs and disbursements) incurred by Cloud9 in attempting to collect such Interconnect POLO's.

3.11    Cloud9 will make Payments to CUSTOMER at 35 days EOM (or as soon as reasonably practical thereafter) as set out on the Customer Care Portal (which calculates the net payments due to Customer as set out in this Agreement) subject to the following:

    3.11.1    CUSTOMER shall provide details and description of the controls in place to identify fraudulent Service Providers; AIT and calls;

    3.11.2    There shall have been no evidence of fraud (which includes without limitation AIT) and Cloud9 shall have the right to perform its own credit and fraud checks from time to time;

    3.11.3    Either party shall notify the other immediately if it suspects fraud or AIT on the Switch Partition; Numbers; the Allocated Numbers or by any of the Service Providers, whereupon Cloud9 shall be entitled to withhold Payments due to CUSTOMER. If it is proven that there is/was no incident of fraud or AIT then Cloud9 shall make the Payments. If fraud or AIT is proven, Cloud9 shall be under no obligation make the Payments to CUSTOMER Cloud9 may, at any time and at its sole discretion, disconnect any Numbers; Allocated Numbers or IMSI's/SIM's in respect of such suspected fraud or AIT;

    3.11.4    Notwithstanding, Cloud9 at its sole discretion may disconnect any Numbers; Allocated Numbers and/or IMSI's/SIMS's in respect of suspected fraud, and withhold any Payments due to CUSTOMER whilst any investigation in process;

    3.11.5    In the event of suspected or AIT, and Payment has already been made with respect to such Service Provider, Cloud9 shall have the right to charge-back CUSTOMER for the Payments made in respect thereof and may, in addition, withhold further Payments;

    3.11.6    If three (3) incidents of fraud/suspected fraud (including AIT) have been detected in respect of one Service Provider or end user/subscriber, Cloud9 shall have the right to (i) request that such Service Provider/end user no longer be permitted access Cloud9's network (and if such request is not honoured, terminate this Agreement); or (ii) at Cloud9's sole discretion terminate this Agreement.

3.12    The Rates payable by each party to the other are exclusive of value added tax (if applicable).

3.13    Cloud9 may, on receipt of a direction from ICSTIS or any regulatory or enforcement agency/body, withhold Payment's due to CUSTOMER or demand claw back of Payment's from CUSTOMER and as appropriate to cover any claims, fines, or administrative charges incurred by Cloud9.

3.13.1    If contracting with Cloud9 as a regulatory approved licensed Communications Service Provider, CUSTOMER shall contract with ICSTIS or other regulatory body in any jurisdiction in which CUSTOMER operated the services set out



in this Agreement and collect and pay all contributions payable thereto in relation to the Numbers and the Allocated Numbers and shall indemnify and keep indemnified Cloud9 in respect thereof. This sub-clause shall survive termination of this Agreement without limitation to point of reference in time.

3.14 If retrospective price changes are implemented with regard to the Interconnect POLO's that result in Cloud9 having effectively overpaid CUSTOMER, then Cloud9 reserves the right to render such charges to CUSTOMER.

3.14.1 Cloud9 may withhold Payments due to CUSTOMER, or demand repayments of Payments made to CUSTOMER, or demand additional payments from CUSTOMER, if CUSTOMER has directly or indirectly contributed to a suspected illegal or fraudulent activity (which shall be considered a breach of use). CUSTOMER agrees to indemnify Cloud9 for any costs and/or losses it may incur (including without limitation legal costs and disbursements) as a result of such breach or use. This sub-clause shall survive termination of this Agreement without limitation to point of reference in time.

3.14.2 Cloud9 may withhold specific Payments due to CUSTOMER, or demand repayment of specific Payments made to CUSTOMER, if British Telecommunications PLC or any other provider of network services to Cloud9 withholds or disputes any Interconnect POLO's due or previously made to Cloud9 which relate to the Numbers or Allocated Numbers ("Disputed Payments"). Such withholding or demand may be made at any time. This sub-clause shall survive termination of this Agreement without limitation to point of reference in time.

3.15 In the event that CUSTOMER is not contracting with Cloud9 for a Switch Partition and the total Number Translation Charges generated by Cloud9 pursuant to this Agreement are less than one thousand five hundred pounds sterling in any given month, CUSTOMER shall immediately pay Cloud9 the shortfall in respect thereof.

3.16 CUSTOMER shall be responsible for connecting its network and all tail circuits (including cost of all SS7 transit; trunk interconnection and tail circuits) to the Cloud9 system.

3.17 Each party shall perform its own testing/acceptance testing at its own cost and expense.

3.18 Where appropriate and/or requested by Cloud9, CUSTOMER shall set its own IOT-Tariff via the Customer Care Portal from time to time which Cloud9 will incorporate in the financial settlement procedure. The default IOT-Tariff is ten percent unless varied by CUSTOMER via the Customer Care Portal.

3.19 CUSTOMER undertakes to use the Services in a manner which generates Revenues for the mutual benefit of the parties to this Agreement.

## SECTION 4 - FINANCIAL SETTLEMENT PROCEDURE

3    Dual-IMSI settlement procedure is as follows:

3.1 Cloud9 will perform all TAP file splitting and CDR generation and billing with regard to the use of the Switch Partition and Dual-IMSI Roaming.

3.2 Cloud9 will provide online CDR's and the TAPIN files generated from use on the Permitted Networks to produce invoices to CUSTOMER.

3.3 CUSTOMER shall remit payment on presentation.

3.4 This procedure shall exclude Bilaterals.

3.5 All payments to CUSTOMER shall in addition be subject to any statutory levy.

3.6 Cloud9 shall be entitled to net-off any monies due to Cloud9 under this or any other agreement with Cloud9 against any Payments due to CUSTOMER.

## HOSTED CRM AND SUBSCRIBER MANAGEMENT/BILLING

5.    Hosted and managed subscriber management and resale billing:

5.1 If CUSTOMER wishes Cloud9 to provide hosted subscriber billing, then Cloud9 will provide a customer care portal for CUSTOMER's subscribers to access their account from where they can manage their account features and billing records/calling plan. This is subject to detailed planning and acceptance from Wire8 (subject to an Order).

5.2 If requested, Cloud9 can also provide electronic top-up features as from time to time available and specified by Cloud9. Where Cloud9 collects payments from CUSTOMER's subscribers then Cloud9 shall act in capacity as reseller of CUSTOMER's services to its subscribers. Cloud9 shall remit to CUSTOMER the amount collected (less the applicable charges specified in Annex A.

5.3 Where Cloud9 is instructed to re-sell and bill CUSTOMER's services on CUSTOMER's behalf subject to an Order, CUSTOMER hereby agrees as follows:

5.3.1 Cloud9 is authorised to resell CUSTOMER's services and bill them accordingly

5.3.2 CUSTOMER hereby holds harmless and indemnifies Cloud9 against:

5.4.2.1 any and all fraudulent or other charges that cannot be collected by Cloud9 for any reasons whatsoever

5.4.2.2 any failure in CUSTOMER's service (for whatever reasons and without limitation including any failure caused as a result of a failure in Cloud9's systems or network)

5.4.2.3 claims of any nature whatsoever made against Cloud9 by a subscriber or third party in relation to CUSTOMER's service

This sub-clause shall survive termination of this Agreement without limitation to point of reference in time.

5.5 CUSTOMER is solely responsible for the delivery/provision of any and all services re-sold to its subscribers by Cloud9.

## SECTION (ii)    -    TELEPHONY - NUMBER TRANSALTION/NUMBERING SPECIFIC SERVICES

### Additional Terms & Conditions

Additional Terms & Conditions applicable to this service (if selected).

1.    ·    SERVICE PROVIDERS & USE OF THE SERVICES

1.1 CUSTOMER shall ensure that all its Service Providers; resellers; information providers; distributors and agents of the Services are bound by the terms of this clause and its sub-clauses throughout the term of this Agreement

1.2 CUSTOMER shall ensure that it, and its Service Providers; resellers and information providers, has received all necessary approvals, licenses, permissions and certificates from any regulator and/or any other body or governmental agency/authority for the Customers' Services offered through Cloud9 and that such licenses, permissions and certificates remain in force and valid

1.3 CUSTOMER acknowledges that it is solely responsible for all and any Customers' Services provided, including content, quality and delivery and also for ensuring that such of CUSTOMER and Service Providers, and each and every reseller and information provider of CUSTOMER and/or Service Providers services comply with the Code, Act and this Agreement

1.3.1 CUSTOMER shall immediately pay all fines, costs and claims (regulatory or otherwise) incurred by Cloud9 in relation to the Customers' Services and the Numbers/Allocated Numbers. In addition CUSTOMER also undertakes to immediately pay Cloud9's administrative costs at the rate of one hundred and twenty five pounds per hour or part thereof in dealing with any and all such matters. This sub-clause shall survive termination of this Agreement without limitation to point of reference in time.

1.4 On request CUSTOMER shall immediately provide Cloud9 and/or any regulator with all information or material relating to the Customers' Services

1.5 CUSTOMER shall immediately notify Cloud9 of any change in it name; constitution; address; telephone numbers and/or the nature of its or its Service Providers services offered

1.6 CUSTOMER shall ensure that neither itself; its Service Providers; information providers or its resellers beach the Code. CUSTOMER shall immediately notify Cloud9 of any breach or potential breach or any event giving rise to a risk of a breach

1.7 Service Provider shall ensure that neither itself nor its information providers or resellers contract with any party whatsoever and how so ever which allows such other party to either directly or indirectly use the Numbers/Allocated Numbers or Termination Numbers other than as set out in this Agreement

1.8 CUSTOMER acknowledges that if Cloud9 is requested, directed or recommended to do so by any regulator or any other governmental agency it may

1.8.1 cease providing the Services without any liability to CUSTOMER whatsoever; and/or

1.8.2 withhold any or all payments due to CUSTOMER

1.8.3 CUSTOMER agrees that it shall have no claim (of whatever nature) against Cloud9 for any action taken by Cloud9 pursuant to this clause 1

1.9 CUSTOMER acknowledges that Cloud9 has the absolute right to monitor all Services and record any calls made to the Numbers/Allocated Numbers

1.10 CUSTOMER shall be solely responsible for:

1.10.1 the quality and delivery of the Customers' Services via the Numbers/Allocated Numbers; and

1.10.2 the quality and delivery of the Services; and

1.10.3 the use of the Numbers/Allocated Numbers

1.11 CUSTOMER shall promptly provide Cloud9 and as appropriate any regulator with such information or material relating to the Customers' Services as is from time to time requested including without limitation copies of recorded messages and information supplied to callers; advertising copy and promotional material for the Customers' Services as well as information which Cloud9 may use for credit checking and debt collection. CUSTOMER hereby consents to such checks being carried out from time to time and furthermore consents to Cloud9 storing and processing such information.

1.12 Notwithstanding any other provision in this Agreement, CUSTOMER irrevocably authorises Cloud9 to share information relating to the Customers' Services; its use of the Services and the conduct of its affairs with Cloud9 with any regulator or other such person, firm or body corporate lawfully requiring access thereto

1.13 CUSTOMER shall ensure that the Customers' Services are lawful and neither infringe any Intellectual Property Rights belonging to Cloud9 or a third party

1.14 CUSTOMER shall ensure that the Customers' Services are not defamatory; libellous or illegal

1.15 CUSTOMER shall ensure that all advertising and promotion of the Customers' Services is carried out so that that publicity from Service
Provider or its information providers, resellers, distributors, agents and subcontractors reflects adversely on Cloud9; or any third party

1.16 CUSTOMER will not state or imply any approval of the Services by Cloud9 and shall not use any words, names or Intellectual Property of Cloud9 in connection with the Services which might imply any connection whatsoever with Cloud9

1.17 CUSTOMER will, on Cloud9's request, obtain and maintain adequate insurance for each claim arising out its breach of this Agreement

1.18 CUSTOMER shall notify Cloud9 of any television based advertising campaigns or other promotions that are likely to result in sudden peaks in Minutes in order that the parties can ascertain whether the anticipated number of Minutes is likely to result in a failure of the Service. CUSTOMER acknowledges that a large number of calls to the Numbers/Allocated Numbers in a short period of time may cause some or all of such calls to fall, or cause a general failure in the Service

1.19 CUSTOMER shall ensure that the equipment it or it s information providers and resellers operates in connection with the Services at all times complies with the relevant provisions of the Telecommunications Act 1984, the Code and any licence granted there under which governs the running of a telecommunications system by the CUSTOMER and shall as necessary comply at all times with the relevant provisions of the Consumer Credit Act 1974 where applicable, the Data Protection Act 1986 and any other applicable legislation

1.20 CUSTOMER shall take such steps as are reasonably necessary to ensure that access to its own and its Service Providers; information providers and resellers Customers' Services is continuous and error free and in particular to ensure that sufficient lines, ports and other apparatus are available to meet all reasonably expected demand thereof, taking account of the fact that access thereto may be achievable not only through use of the Services but also through the systems of other public telecommunication operators. Furthermore Cloud9 shall have the right in its absolute discretion to suspend, bar or restrict access to the Customers' Services if at any time the number of calls or attempted calls to the Numbers/Allocated Numbers causes or is liable to cause congestion or other disruption within



any part of Cloud9's system. Cloud9 may from time to time impose traffic restrictions on particular Numbers/Allocated Numbers to protect service quality.

1.21 **In respect of Personal Numbers (as defined by Ofcom) shall only be used in the manner and way specified from time to time by Ofcom, and CUSTOMER shall pay particular regard to the personal numbering directive issued by Ofcom ("the Personal Numbering Directive"). CUSTOMER shall ensure that each of its Service Providers and end users are aware of the Personal Numbering Directive and comply with the same at all times. Payments in respect of Personal Numbers are at all times subject to additional one month retention in addition to the normal payment schedule detailed in this Agreement.**

**SECTION (iii) - COLOCATION AND IP SERVICES**

**Additional Terms & Conditions**

Additional Terms & Conditions applicable to this service (if selected).

1. INTERNET SERVICE & EQUIPMENT

1.1 If CLOUD9 orders or purchases any equipment (including but not limited to circuit and router equipment) identified on the Order on behalf of CUSTOMER prior to either expiry or termination of this Agreement or any notification relating thereto, CUSTOMER shall, in the event of an early termination of this Agreement by either party for reasons other than CLOUD9's convenience, be responsible for reimbursing CLOUD9 for all payments made by CLOUD9 in connection with the purchase of such equipment and shall immediately assume responsibility for any outstanding payments for such equipment, until paid in full. The foregoing obligation shall survive any expiry or termination of this Agreement without limitation to point of reference in time.

1.2 CLOUD9 shall maintain and control ownership of all IP numbers and addresses that may be assigned to CUSTOMER by CLOUD9, and CLOUD9 reserves the right to change or remove, in its sole discretion, any and all such IP numbers and addresses.

1.3 If CUSTOMER is assigned a static IP address, CUSTOMER consents to CLOUD9's inclusion of CUSTOMER's name, company name (if a business), postal address, e-mail address, IP address, and telephone number in any rwhois server.

2. CACHING

2.1 CUSTOMER expressly (i) grants to CLOUD9 a license to cache the entirety of CUSTOMER's Web site/servers, including content supplied by third parties, hosted by CLOUD9 under this Agreement and (ii) agrees, represents and warrants that such caching is not and will not constitute an infringement of any of CUSTOMER intellectual property rights or any third party's intellectual property rights.

3. BANDWIDTH AND/OR DISK USAGE

3.1 CUSTOMER acknowledges that bandwidth and/or disk usage shall be used strictly for lawful purposes only and in any event shall not exceed the number of megabits per month on a 95th percentile basis for the Services ordered by CUSTOMER on the Order. CUSTOMER acknowledges and understands that CLOUD9 shall be entitled to monitor CUSTOMER's usage on a continuous or other basis. If bandwidth or disk usage exceeds the agreed upon number of megabits per month, CLOUD9, in its sole discretion, may assess additional standard charges, disconnect or discontinue any and all Services, or terminate this Agreement, in each case. In the event that CLOUD9 elects to take such action, CUSTOMER shall not be entitled to a refund of any fees paid in advance of such corrective action. CUSTOMER shall be entitled to monitor bandwidth usage via such methods from time to time agreed between the Parties.

4. EQUIPMENT

4.1 CLOUD9 is acting only as a reseller and/or provider of any hardware, software, circuits and equipment (collectively, the "Equipment") manufactured by a third party, and offered under this Agreement. Any malfunction of, or manufacturer's defects or other defects outside the control of CLOUD9 in Equipment either sold or provided by CLOUD9 to CUSTOMER or purchased directly by CUSTOMER and used in connection with the Service(s) will not be deemed a breach of CLOUD9's obligations under this Agreement. Any rights or remedies CUSTOMER may have regarding the performance or compliance of such Equipment are limited to those rights (if any) extended to CUSTOMER by the manufacturer of such Equipment. CUSTOMER is entitled to use any Equipment supplied by CLOUD9 only in connection with CUSTOMER's permitted use of the Service(s). CUSTOMER shall not resell, transfer, export or re-export any such Equipment, or any technical data derived there from, in violation of any applicable law or regulation, including without limitation, export control laws or regulations. CLOUD9 shall not be responsible for any changes in Service(s) outside its control that cause CUSTOMER's Equipment to become obsolete, require modification or alteration, or otherwise affect the performance of the Service(s). However, if practicable (without an obligation to expend funds or incur additional costs), CLOUD9 may assist CUSTOMER in resolving any such Equipment problems over which CLOUD9 may have control. All Equipment and Hardware provided under this Agreement by CLOUD9 shall absolutely remain the property of CLOUD9 or the respective owner at all times and nothing in this Agreement or otherwise shall constitute the transfer of ownership thereof (under any circumstances whatsoever) to the CUSTOMER or any third party. CUSTOMER shall have no right to physical access to any equipment provided by CLOUD9. CUSTOMER is not entitled to direct access to CLOUD9 collocation facilities, but if CLOUD9 shall grant access it shall be entitled to charge CUSTOMER its normal hourly Charges for supervising CUSTOMER at CLOUD9's facilities and CUSTOMER's own equipment ("Co-located Equipment"). Access by CUSTOMER to the Co-located Equipment may be subject to certain security checks and CLOUD9 and or its representatives; agents or suppliers may be entitled to monitor and record CUSTOMERs activities. CLOUD9 and or its representatives; agents or suppliers may also cancel or terminate such access if in their opinion it is or will involve a



security threat or breach of any provisions of this Agreement or as is otherwise necessary so as to protect CLOUD9's network or facility in which case CUSTOMER shall not be entitled to any compensation or incur any other rights or by entitled to any other remedy whatsoever.

5.    DISCLAIMER

5.1    TO THE EXTENT PERMITTED BY APPLICABLE LAW, NEITHER CLOUD9, ITS EMPLOYEES, AFFILIATES, AGENTS, SUPPLIERS, THIRD-PARTY INFORMATION PROVIDERS, MERCHANTS, LICENSORS NOR THE LIKE MAKE ANY WARRANTIES OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF SATISFACTORY QUALITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT FOR THE SERVICES OR ANY EQUIPMENT CLOUD9 PROVIDES. NEITHER CLOUD9, ITS EMPLOYEES, AFFILIATES, AGENTS, THIRD-PARTY INFORMATION PROVIDERS, MERCHANTS, LICENSORS OR THE LIKE, WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE; NOR DO ANY OF THEM MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SERVICES OR AS TO THE ACCURACY, RELIABILITY OR CONTENT OF ANY CUSTOMERS' SERVICES OR MERCHANDISE CONTAINED IN OR PROVIDED THROUGH THE SERVICES. CLOUD9 SHALL NOT BE LIABLE FOR THE CONTENT OR LOSS OF ANY DATA TRANSFERRED EITHER TO OR FROM CUSTOMER OR STORED BY CUSTOMER OR ANY OF CUSTOMER'S USERS, SUBSCRIBERS OR CUSTOMERS VIA THE SERVICE(S) PROVIDED BY CLOUD9.

6.    CUSTOMER CONTENT AND DATA TRANSFER

6.1    CUSTOMER is solely responsible for all its own and any third parties content residing on the Equipment ("CUSTOMER Content") and, except as otherwise agreed with CLOUD9, for the backup and restoration of such CUSTOMER Content. CUSTOMER represents and warrants that CUSTOMER has the right and ability to provide CLOUD9 with the CUSTOMER Content (including any third party content) provided to CLOUD9 during the course of this Agreement and that all CUSTOMER Content does not infringe any patent, copyright or any other proprietary rights of a third party, or violate data protection laws. CUSTOMER acknowledges and agrees that CUSTOMER has been provided with information about or has had the opportunity to inquire into the technical and organizational security measures adopted by CLOUD9 (the "CLOUD9 Measures") against unauthorized or unlawful access to, disclosure or processing of, and accidental loss and destruction of or damage to, any data that CUSTOMER has provided to CLOUD9 about any identified or identifiable natural person (collectively, "Personal Data"), including without limitation any Personal Data contained within the CUSTOMER Content. CUSTOMER further acknowledges and agrees that CUSTOMER is solely responsible for inquiring into the appropriateness and adequacy of the CLOUD9 measures and that it alone has the information relevant about the type of Personal Data which CUSTOMER controls or processes to make such determination. By entering into this Agreement, CUSTOMER confirms that (having regard to the state of technological development and the cost of implementing any measures) the CLOUD9 Measures ensure a level of security appropriate to (a) the level of harm that might result from such unauthorized or unlawful access, disclosure or processing or such accidental loss, destruction of, or damage to any Personal Data, and (b) the nature and sensitivity of such Personal Data to be protected. The parties agree that, with respect to CUSTOMER Content, CLOUD9 is not a "data controller" as defined in the Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the4 protection of individuals with regard to the processing of personal data and on the free movement of such data for any CUSTOMER Content. CUSTOMER acknowledges and agrees that Personal Data and CUSTOMER Content may be stored on CLOUD9's servers and other equipment in the United Kingdom and Europe and/or in countries or territories outside the European Union, in which data protection laws may not be as comprehensive as in the European Union. CUSTOMER further acknowledges and agrees that CLOUD9 may transfer such data and content to, or access such information or data from, the United States and/or other countries or territories outside the European Union in which data protection laws may not be as comprehensive as in the European Union, and may transfer such Personal Data and CUSTOMER Content to third parties, to the extent permitted under the Privacy Policy and the AUP. In the event of termination of this Agreement as set out in this Agreement CLOUD9 agrees to remove the CUSTOMER Content from the Managed Servers forthwith.

7.    MANAGED SERVICES/SERVER PROVISIONS

7.1    *General*: CLOUD9 provides certain equipment used in Internet connectivity services ("Hardware"), space in its business premises to store and operate such Hardware ("Space") and licensing, where necessary, of the associated operating system and Web server software (the "Software"), together comprising a managed server package.

7.2    *Managed Server Set-Up and Updating*. CLOUD9 will initially configure the Hardware and Software (as configured, the "Managed Server") for use. After the Managed Server is configured, the CUSTOMER will be solely responsible for all content management in connection with the Managed Server. CLOUD9 shall provide CUSTOMER with the maintenance and support services for the Hardware and/or Software, if any, specified in the Service Order Form, which shall include the uploading of content onto the Managed Server. CUSTOMER understands that such maintenance and support services may require server downtime at Cloud9's sole discretion.

7.3    *Exclusions*. The support SLA shall not include services for problems arising out of tampering, modification, alteration, or addition to the Equipment; Hardware or Software supplied by or modified by CUSTOMER.

7.4    *CUSTOMER's Duties*. CUSTOMER shall document and promptly report all errors or malfunctions of the Hardware and/or Software to CLOUD9 at the Portal. CUSTOMER shall take all steps necessary to carry out procedures for the rectification of errors or malfunctions within a reasonable time after such procedures have been received from CLOUD9. CUSTOMER shall maintain a current archive copy of all data to the extent CUSTOMER is authorized or otherwise has the right to do so. CUSTOMER shall properly train its personnel in the use of the Hardware and Software. CUSTOMER authorizes CLOUD9 to maintain an archive copy of all data and CUSTOMERs data stored on the Managed Server throughout the term of this Agreement and for the purpose of re-instating such of data and CUSTOMERs Data, but this shall not commit CLOUD9 to providing such back up and/or re-instatement service to CUSTOMER.

7.5    *Substitution*. CLOUD9 reserves the right to substitute, change or modify its Services; Equipment; Hardware or Software at any time and/or the technical parameters of the Services provided that it does not materially affect the quality or performance of the Services offered to CUSTOMER.

(18)



(19)



1.19    CUSTOMER will, on Cloud9's request, obtain and maintain adequate insurance for each claim arising out its breach of this Agreement

1.20    CUSTOMER shall notify Cloud9 of any television based advertising campaigns or other promotions that are likely to result in sudden peaks in Minutes in order that the parties can ascertain whether the anticipated number of Minutes is likely to result in a failure of the Service. CUSTOMER acknowledges that a large number of calls to the Premium Rate Numbers in a short period of time may cause some or all of such calls to fail, or cause a general failure in the Service

1.21    CUSTOMER shall ensure that the equipment it or it s information providers and resellers operates in connection with the Services at all times complies with the relevant provisions of the Telecommunications Act 1984, the Code and any licence granted there under which governs the running of a telecommunications system by the CUSTOMER and shall as necessary comply at all times with the relevant provisions of the Consumer Credit Act 1974 where applicable, the Data Protection Act 1986 and any other applicable legislation

1.22    CUSTOMER shall take such steps as are reasonably necessary to ensure that access to its own and its Service Providers; information providers and resellers Customers' Services is continuous and error free and in particular to ensure that sufficient lines, ports and other apparatus are available to meet all reasonably expected demand thereof, taking account of the fact that access thereto may be achievable not only through use of the Services but also through the systems of other public telecommunication operators. Furthermore Cloud9 shall have the right in its absolute discretion to suspend, bar or restrict access to the Customers' Services if at any time the number of calls or attempted calls to the Premium Rate Numbers causes or is liable to cause congestion or other disruption within any part of Cloud9's system. Cloud9 may from time to time impose traffic restrictions on particular Premium Rate Numbers to protect service quality.


## SECTION (v)   -    MOBILE BASED SERVICES (GSM/UMTS and SIP)

### Additional Terms & Conditions

Additional Terms & Conditions applicable to this service (if selected).

### 1.    ROAMING

1.1    CUSTOMER's use of the DIR or other such roaming solutions provided by Cloud9 allows CUSTOMERS subscribers to out-roam into all foreign networks from time to time available via the respective IMSI's ("Permitted Networks"). CUSTOMER acknowledges that the list of Permitted Networks varies from time to time and is outside the control of Cloud9. Cloud9 will publish a list of Permitted Networks at the Customer Care Portal. Where CUSTOMER is a licensed spectrum holding mobile operator ("MO") the DIR service can also be used to extend CUSTOMERS In-roaming capabilities subject to a separate Order and may require detailed planning to work effectively.

1.3    The list of Permitted Networks is available at the Customer Care Portal.

1.4    Unless specifically agreed to the contrary on an Order, CUSTOMER's subscribers shall be permitted to make and receive calls; text messages and use other network and data features. If CUSTOMER wishes to authenticate users then this will be achieved by Cloud9 sending authentication requests to CUSTOMER via HTTP unless CUSTOMER supports SS7 in which case SS7 will be used. If CUSTOMER fails to respond (or does not respond in a timely fashion) Cloud9 reserves the right to drop the authentication request and/or deny CUSTOMERS subscribers access to requested services and without any requirement to report the same to CUSTOMER. It is CUSTOMERS obligation to respond to requests from the Cloud9 system in a timely fashion. CUSTOMER assumes all risk and financial liability for any charges (or losses) incurred by its subscribers for any failures in the authentication process.

1.5    CUSTOMER acknowledges that authentication (using Camel) is not available in all foreign networks, and in some cases this will prohibit CUSTOMER's subscribers from sending or receiving calls (and using other network services).

### 2.    USSD

2.1    Cloud9 will, subject to an Order, expose USSD messaging to CUSTOMER.

2.2    Cloud9 does not warrant that USSD shall be universally or continuously available. Cloud9 specifically excludes any warranty for fitness for purpose or reliability of USSD even where SLA is provided pursuant to clause 2.2 of main body Agreement.

2.3    USSD is not designed as a replacement service to roaming.

### 3.    HOSTED AUTHENTICATION

3.1    Where CUSTOMER wishes Cloud9 to host its customer billing records ("Hosted Data"), Cloud9 shall provide access to such data either via ODBC or WEB access (subject to an Order).

3.2    It is CUSTOMERS obligation to keep the Hosted Data up to date and backed up at all times.

3.3    In the event there is insufficient balance then roaming will be denied.

### 4.    SMS TRANSIT

4.1    Cloud9 will provide transit ingress and egress of all CUSTOMERS SMS MO and MT SMS traffic using Cloud9's GT and SMSC.

4.2    Cloud9 will transit SMS to/from CUSTOMER using SS7; SMPP; SIP (if applicable) or HTTP.

4.3    Delivery receipts are provided where available only.

4.4    Cloud9 reserves the right to block any SMS traffic it believes is spam.

4.5    Cloud9 does not support bulk SMS transit. This may be available from time to time by separate negotiation.

4.6    SMS transit is only available to Permitted Networks.

4.7    Senders MSISDN addresses are transmitted with SMS messages (where provided).



20

5.    GPRS & DATA TRAFFIC

5.1    GPRS and data access is provided (subject to an Order) only where available.
5.2    Cloud9 will route data traffic via its own APN unless agreed to the contrary with CUSTOMER.
5.3    The methodology deployed for GPRS/Data access is usually GRX backbone roaming, but is subject to Cloud9's absolute and sole discretion at all times.
5.4    CUSTOMER should note that GPRS and data access is not widely available in roaming scenario and may be subject to detailed interworking and in some cases not available at all.

6.    SIM CARD PRODUCTION & MANAGEMENT

6.1    Unless agreed to the contrary, CUSTOMER is responsible for all SIM card production.
6.2    CUSTOMER should refer to Cloud9 for specific instructions on implementing SIM applications and necessary applications/algorithms required for interworking with Cloud9.
6.3    Cloud9 assumes no responsibility for interoperability failure in CUSTOMER own SIMS.  CUSTOMER is advised to submit SIM's to Cloud9 for testing.
6.4    CUSTOMER assumes all risk in production and operation of SIMS.
6.5    Cloud9 will, if it deems appropriate, submit SIMS's to CUSTOMER for interworking/testing.

Annex C

## Service Description

## INTERCONNECT CIRCUITS:

Interconnect circuits are available as E1/TDM as Q931 or C7, or alternatively as channelised VOIP in almost all H323 and/or SIP codec's i.e. compressed or uncompressed.   VoIP is specified in logical E1 (30 channels) and please note that:
- SIP is available as both Interconnect (IP trunk group authentication) and client/end user termination (SIP registration method)
- H323 is only available as Interconnect (IP trunk group authentication to Wie's GW only).

For VoIP interconnect services, H323 is recommended, but SIP is available.  Interconnect is considered carrier transit trunks not fully supporting all class 5 features although some can be supported i.e. Ring Back Tone ("RBT").

Wie9's voice trading platform is only available using SIP and the G711A protocol and is available in GW and GK mode,

Cloud9's virtual/distributed PBX and resale consumer VoIP service only supports SIP via Cloud9's GK.

Interconnection to Cloud9's MOBILE services is only available via SIP.

Cabling and sundries are priced on application.  Installation payable in advance of turn-up.  CUSTOMER responsible for all tail circuits to be provided as Balun converters to ITU RJ45 E1 specification.  Initial configuration of trunks and testing is included in prices, however, re-testing or configuration once CUSTOMER has accepted an interconnect circuit is chargeable at Cloud9's standard hourly rate.

CUSTOMER can configure multiple sub-clients and switch calls to/from their own and sub-clients trunks in addition to Cloud9 trunk groups (ingress and egress).  This also gives anyone connected to a trunk access to all Cloud9 switched services and applications.  Cloud9 will gladly add applications on demand subject to a separate quotation and Order.  Cloud9 has significant programming and development skills to integrate to most third party systems via SS7; HTTP and proprietary/OSBD/Database methodology on request.  IVR; call recording; call and video conferencing (landline and dmobile/3G) are also available.

## MOBILE SERVICES:

Wie9 operates its own HLR; MSC and SMSC which are interconnected to global mobile operators via SS7 interworking as a Tier1 operator.  Cloud9 has developed its own MVNO HOSTING PACKAGE which enables would be or new entrant MVNO's to further their opportunities; market share and maintain control of their own destiny by having their own mobile interconnects; HLR and SMSC.  CUSTOMER can host their MVNO on Cloud9's network, which also provides all Global Title; SMS messaging and GPRS/Data access.  Cloud9 can interoperate with CUSTOMER via SS7; SMPP and also by private 'HTTP' or ODBC/Database signalling methods.  Cloud9 also has various other bespoke mobile applications and can operate everything from the core network to the edge BTS and Air Interface in small corporate/campus environments all the way up to full-scale macro mobile networks.  Cloud9's mobile services are very unique, and engineered in-house to specific requirements, but also include the basic services such as signalling; USSD; SMS; GPRS and all managed on-line real time billing in respect thereof (this includes customer/Interconnect billing as well as customer based Camel real time billing mechanisms).

'Dual-IMSI only' service is designed for Mobile Operators seeking to enhance their IN-Roaming capabilities and also their OUT-Roaming capabilities.  This service is included in the MVNO HOSTING PACKAGE but in the MVNO hosting package does not include IN-Roaming capabilities.  If MVNO HOSTING PACKAGE is required with IN-Roaming then CUSTOMER must also select Dual-IMSI roaming in addition.

## CLOUD9 NETWORK & SUPPORT:

Cloud9 network is exclusively based in London's premiere Telehouse centre.  In Telehouse North Cloud9 operates its ISP business; wireline/fixed switched and VoIP network and also its GSM/3G mobile international networks.

The IN system; billing system and Authentication centre with proprietary signalling system is designed and operated by Cloud9.  Cloud9 operates all its services online via the Customer Care Portal were all Services are accesses; provisioned and configured in real time.  All support and stats; CDR's; rates and billing are also maintained electroOnicalllly online at the Customer Care Portal.

All new CUSTOMERS are allocated a unique username and password to manage their services and billing at the Customer Care Portal.  CUSTOMER must ensure that you have your login and that we have the correct email address(s) for billing/rate and support issues.

## PRICES QUOTED:

All prices in £GBP.

Late payments subject to 5% per month interest, and/or statutory interest (whichever is the greatest).




Usage based charges are invoiced (unless agreed to the contrary) monthly and due on presentation.

All recurring and non-recurring charges are invoiced quarterly in advance. Invoices payable quarterly in advance, with one quarter on account as deposit. Further deposits and/or or securitisation may be required (if required usually in the form of an Irrevocable Standby Letter of Credit subject to International Standard Practices (ISP98), ICC Publication No.590).

**CLOUD9 Transit Egress Rates** and **CLOUD9 IOT Rates** are published on the Customer Care Portal which is at Cloud9's sole discretion from time to subject to change at Cloud9's absolute and sole discretion by the issuing of a Charge Change. It is CUSTOMERS duty to check these regularly and specifically on receipt of a Charge Change Notice. Cloud9 does not issue manual or fax price changes, as they are all issued electronically online. CUSTOMER shall be considered to have accepted a Price Change Notice if traffic is sent or generated after the effective date of a Charge Change Notice and a claim of no knowledge of the same shall not constitute a dispute or right to challenge the rate/rate changes.

## IMPORTANT SERVICE NOTES & DESCRIPTION:

CLOUD9 has taken care to describe the Services it can provide as carefully and specifically as possible, but in some cases a bespoke Service may be required. CUSTOMER shall refer to CLOUD9 on specific guidance on Services covered by this Agreement. CUSTOMER shall, where requested by CLOUD9, provide all information sought by CLOUD9 in the provision of services to ensure that CLOUD9 can quote and provide the most appropriate and applicable Service to CUSTOMER.

- **MVNO HOSTING PACKAGE & DUAL-IMSI ROAMING**
  CUSTOMER should be aware that the MVNO HOSTING PACKAGE is targeted at enabling CUSTOMER as a mobile virtual network operator. This Service gives CUSTOMER the ability to operate as a domestic operator that might also wish to utilise Cloud9 allocated IMSI's and Numbers. It is also possible to use the MVNO HOSTING PACKAGE partially or fully in a foreign market to interwork with CUSTOMERS existing configuration/systems/network – utilising Cloud9's Global Title Translation and signalling service ("GTT") and short message service centre ("SMSC") or elements thereof on a bespoke basis as a hybrid MVNO service. Various configurations are available from time to time on request in addition to the standard MVNO HOSTING PACKAGE, and Charges in addition (or substitution to those specified in Annex A may prevail).

  MVNO HOSTING PACKAGE also includes the ability to roam internationally at the list of worldwide mobile networks listed at http://www.Cloud9.com. This is achieved using a Dual-IMSI roaming ("DIR") solution powered and operated by Cloud9 in cooperation with third party MO's. The purpose of the DIR service is to enable out-roaming on the MVNO HOSTING PACKAGE into foreign visited networks ("VPLMNS). Non-licensed/spectrum holding MO's will be classified as MVNO's on the Cloud9 network and may only utilise the MVNO HOSTING PACKAGE, whereas Licensed Mobile Operators interested in simple DIR (not using Cloud9's MVNO HOSTING SERVICE) will need to liaise with Cloud9 to enable In-roaming. *PLEASE NOTE that whilst the DIR will generally support Universal Supplemental Data Service ("USSD") Cloud9 does not warrant that USSD shall be universally or continuously available. Cloud9 specifically excludes any warranty for fitness for purpose or reliability (in any way whatsoever) of USSD services and advises CUSTOMER not to enter into or otherwise rely this Agreement in any way whatsoever if CUSTOMERS sole requirement is USSD signalling.*

  IMPORTANT NOTICE:
  Whilst all Cloud9 services can generally be resold, CUSTOMER is strictly prohibited from reselling (or otherwise engaging on the process of re-packaging or allowing others to implement in any other way whatsoever) the MVNO HOSTING PACKAGE/DIR and/or any elements thereof whatsoever. Any breach of this covenant will constitute a serious breach of this Agreement and Wier9's intellectual property (and agreements with others) and will consequently result in instant disconnection without notice, whereby CUSTOMER acknowledges that Cloud9 shall be entitled to injunctive relief and a claim for damages. If such action is necessary, CUSTOMER will hold harmless, indemnify and keep indemnified Cloud9 against all costs; damages (including without limitation legal fees and disbursements) in pursuing any such legal action described in this paragraph.

- **DUAL –IMSI ROAMING PROHIBITIONS**
  Shall not be used by CUSTOMER other than for international roaming. It shall be considered a breach of this Agreement if CUSTOMER solely intends to use DIR to develop a virtual mobile service in a specific territory(s) or country(s) rather than a true international roaming service. Cloud9 shall be entitled (at its absolute and sole discretion and with final authority) at any time to restrict access to certain countries/networks using DIR if it believes or suspects that this is the case.

**Annex D**

**Standby Letter of Credit**

[TO: CLOUD9 MOBILE COMMUNICATIONS (WHOLESALE SERVICES) LTD – Beneficiary]

[DATE]

Dear Sirs,

# IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER: [NUMBER/REFERENCE]

In accordance with instructions received from [CUSTOMER] (hereinafter called the Applicant), we
.............................. Bank PLC, of ............................., hereby issue in your favour an irrevocable standby letter of
credit for £[AMOUNBT] (AMOUNT AND CURRENCY IN WORDS) available by your drafts drawn on us at sight
accompanied by the following documents.

     1.      Your signed written statement that the Applicant has failed to perform his/her payment obligations
               under the terms of the Cloud9 Mobile Communications (Wholesale Sservices) Ltd Master Services
               Agreement dated ...............................
     2.      Copy of invoice marked "UNPAID"

Any claims must bear the confirmation of your bankers that the signatures thereon are authentic.

This credit is available for presentation of documents to us until [insert date 3 years after execution]

Drafts drawn hereunder may be in full or part value of the credit under each revolution of the credit.

Drafts drawn hereunder must be marked "Drawn under ............................. Bank PLC of .............................,
Standby Letter of Credit Number [NUMBER/REFERENCE].

We undertake that drafts and documents drawn under and in strict conformity with the terms of this credit will
be honoured upon presentation.

Subject to Uniform Customs and Practice for Documentary Credits (1993 Revision), ICC Publication No.500.

**[OR]**

Subject to International Standard Practices (ISP9B), ICC Publication No.590.

Yours faithfully
For an on behalf of
............................. Bank PLC.

**AUTHORISED BANK SIGNATORY**               **AUTHORISED BANK SIGNATORY**

*(to be issued direct to Cloud9 by CUSTOMERS Bank in writing on Bank letter headed paper)*



EXHIBIT B



# Order Form

15 May 2007

This document once signed by the parties hereto constitutes a formal Order as defined in the Master Services Agreement already entered into between the Parties ("MSA").

The terms and conditions of the MSA shall apply to this Order.

All rates quoted in pounds sterling and exclude VAT.  Prices valid for 30 days from issue.

The term "Company" shall mean:

Cloud9 Mobile Communications (Wholesale Services) Ltd







The Information contained within this document is privileged and confidential to the
names recipient.  Neither this document, or anything contained herein, maybe
disclosed or otherwise disseminated to a third party without the authors prior written
and signed consent.

<u>IMPORTANT NOTICE</u>

This is not an offer.

This Order shall be signed by Customer and sent to Company for review and
shall only be deemed accepted by Company once
countersigned and returned to Customer (the "Acceptance Date").

This Order, once accepted by Company, is subject to provisions and jurisdiction specified in MSA.







## CUSTOMER DETAILS – Legal

Customer Full Legal Name ("Customer")
BlueFire Wireless Inc.

Registered Office
515 Madison Avenue,
Suite 1910,
New York, NY,
10022,
USA.

Usual Business Address
As Above

Registered Number

VAT Number (if appropriate)

## CUSTOMER DETAILS – Commercial & escalation contact

Contact (Authorised Signatory)

Tel
001 212 753 5524 (USA)
+44 1223 890474

Mobile
+44 7876 200290

Fax

Email
markf@bluefirewireless.com
armand@bluefirewireless.com

## CUSTOMER DETAILS – Billing contact

Contact (billing)
Mark A Fletcher
Armand Ventura

Tel
As Above

Mobile
As Above

Fax

③



Email
As Above



**CUSTOMER DETAILS – Technical contact**

Contact (technical)

Tel

Mobile

Fax

Email

**CUSTOMER DETAILS (Other)**

Contact (technical)

Tel

Mobile

Fax

Email
.

Special notes:







## FINANCIAL & BILLING REQUIREMENTS

PAYMENT TERMS

| | |
|---|---|
| Non-Recurring Charges | in advance as per MSA prior to configuration |
| Recurring Charges | quarterly in advance prior to activation |
| Usage-based Charges | billed monthly within 5 days of the end of the billed month, and payable strictly on presentation of invoice by electronic bank transfer only to account |

Cloud9 Mobile Communications (Wholesale Services) Limited

Barclays Bank PLC

Corporate Division – Douglas, Isle of Man

Sort Code: 20-26-74

IBAN GB54 BARC 2026 7473 0199 33Security

VAT# GB002523435

| | |
|---|---|
| LIMIT: | The sum equivalent to one months estimated Usage-based Charges. |
| TERMS: | The Security shall be issued by Customer prior to activation of Services and if Customers spend increases or is likely to increase beyond the LIMIT specified above then Company may give Customer shall be obliged to increase the security within three banking days notice. If Customer fails to increase the Security on such notice (or otherwise defaults on any payment due to Company) then Company may immediately suspend all Services without recourse or liability whatsoever to Company until Customer complies with any such obligation. |
| | Company may claim under the Security for any and all amounts payable under the MSA and this Order. |

| | | |
|---|---|---|
| CALL TIMES: | Peak | 08:00 – 18:00 Monday - Friday |
| | Off-Peak | All other times Monday - Friday |
| | Weekend (Super Off Peak) | All day Saturday & Sunday |

| | |
|---|---|
| IOT: | IOT is the standard tariff published by each mobile operator as maintained by the GSM Association. Customer accepts the nature and implementation of IOT rates as specified by the GSM Association and furthermore acknowledges that they vary without notice from Company to Customer from time to time. Company will apply blending to IOT to cover its maximum exposure where it is necessary i.e. where target/VPLMN cannot be accurately billed in real time |







| | |
|---|---|
| GROUP NETWORKS: | Cloud9 Mobile (Isle of Man), and any other from time to time operated by Company or Group member thereof as from time to time notified by Company to Customer, hereinafter "GN". Service is NOT permitted in GN's. |
| | NB: all other networks fall under "IOT Network". |
| CAPACITY PLANNING: | Customer is solely responsible for giving Company detailed traffic profiles and capacity orders quarterly in advance (at least one quarters in advance of the next quarter). Company is not obliged to provide any capacity not forecasted and ordered by Customer. |
| IMPORTANT NOTICE: | If Company receives a request from a mobile operator to bar/restrict Customers (or Customers end users) access to its network for any reasons whatsoever, Company shall be entitled at its absolute and sole discretion to immediately impose such a bar/restriction. Such action by Company to honor such a request shall not constitute a breach of this Order or the MSA under any circumstances whatsoever. |







## SERVICES & CHARGES APPLICABLE TO THIS ORDER

Pursuant to Annex A of the MSA, Customer wishes to order and Company wishes to provide the following:

Non-Recurring Charges ("NRC")

| ITEM | QUANTITY | DETAILS | COST | TOTAL COST |
|------|----------|---------|------|-----------|
| (12) | 1 | Signaling service | 2,000.00 | 2,000.00 |
| (18) | 1 | Mobile switch partitioning service (Inc MVNO) Carrier to carrier hosted mobile switch partition signaling transit and mobile platform service | 35,000.00 | 35,000.00 |
| (23) | 10,000 | IMSI's (Cloud9's dual-IMSI partner range) *Special condition:* *i. must order 25,000 within 12 months of date of this Agreement; AND* *ii.. must order 50,000 within months 12 to 24 of this Agreement; AND* *iii.. must order 75,000 within months 12 to 24 of this Agreement; AND* *Thereafter subject to review.* *Additional notes:* *The expectation is Customer will have 25,000 active SIM's within months 12-24, and 38,000 within months 25 to 36* | 2.00 | 20,000.00 |
| (NEW) | 10,000 | SIM cards (printed process color each side) | 1.56 | 19,700.00 |
| (NEW) | 20,000 | MSISDN's (Isle of Man mobile/FM1) | 0.00 | 0.00 |

SUB-TOTAL (NRC)                                                                    76,700.00*

Usage-based Charges – quarterly in advance ("UBC")

| ITEM | CHARGED | DETAILS | UNIT COST |
|------|---------|---------|-----------|
| (18) | 1 | Mobile switch partitioning service (inc MVNO) Carrier to carrier hosted mobile switch partition signaling transit and mobile platform service NOTE: *This is waived for the first 6 months of this Agreement.* | **18,000.00** |
| (20) | per MSU | SCCP signaling | 0.004 |
| (21) | per MSU sent & received | USSD signaling service (2 MSU's per MOC) *[premium]* | 0.009 |
| (22) | per CDR | Hosted billing (per IOT network CDR's sent to Company for settlement) | 0.003 |





| (24) | usage charges | as per MSA; less | |
| | | *[this is for all usage in any network i.e. including* | |
| | | *Without limitation voice; SMS; data; premium services etc]* | |
| | | Transit Element Fee B | 0.06 |
| | | *Subject to change with 1 months notice* | |
| (NEW) | revenue share | MSISDN (rebate paid to Customer of POLO [variable]) | 70% |
| | | *This is subject to change and will track the actual POLO's* | |

Payable in advance

Non-Recurring Charges                                                76,700.00

Recurring Charges    (plus usage fees)
NOTE: *Item (18) is waived for the first 6 months of this Agreement*

Security                     (Standby Letter of Credit or Deposit held as security)      15,000.00

Total payment required before Activation              (Pre-pay)         **91,700.00**







**Action Points:**

Company will process this Order and commence engineering and test work on Acceptance Date. Standard implementation time is expected to be 6 to 8 weeks, however, Company will Endeavour to implement as soon as is reasonably possible – aiming for (but not committed to) mid to end June (subject to payment).

Payment and Security is required before testing and implementation can take place. Testing shall constitute:

(1)  Cloud9 shall set-up and configure system after receipt of NRC cleared funds) allocate 10 test blank/white SIM cards

(2)  Cloud9 shall data fill the test IMSI's relating to the SIM cards in its HLR

(3)  Customer shall perform testing of LU (Location Update); MO Call and MT call (call-back) and Cloud9 shall duplicate (in IOM and/or UK). This shall be conducted over 25 days from supply of required test SIM cards. In the event of no confirmed report of the test from Customer, Company shall be entitled to consider the tests passed if its own tests or analysis of Companies and/or Customers tests show successful. Failure in MTC's due to originating network failing to data build Company's ranges shall not constitute failure of these tests, but shall be dealt with as normal fault management – primarily by Customer or Customer's end user reporting such issues to the originating carrier.

(4)  Provided that the tests carried our by either Customer or Cloud9 as specified in (3) above pass, in the case of the latter with evidence to Customer by Cloud9, then the testing shall be deemed completed and systems readiness notice shall be sent to Customer, at which point the Service shall be Activated (provided Company is in receipt of all required payments).

**NOTE: failure in phase (3) shall result in a full refund to Customer of NRC charges paid to date.**

Activation shall render Service operational.

The authorized signatory of Customer below hereby warrants that he/she is fully authorized and has full binding capacity on behalf of Customer to enter into this agreement, and hereby holds harmless and indemnifies Company in respect of any and all charges, costs and disbursement in respect of this Agreement and all charges due hereunder and/or enforcement of any provisions thereof.

Signed for:

Customer

By:   *M. A. Fletcher*
Position: Authorized signatory

Date:   *15th May 2007*

Company

By:
Position: Authorized Signatory

Date:   *15/5/07*



# Service Literature & Implementation Guidelines

## Mobile core network interop & specification

## IN STRICT COMMERIAL CONFIDENCE

## GSM

## Signaling and MVNO service





## Contents

1.  Introduction                                    21

2.  High Level Solution Description                 5-8

3.  Timelines                                       24

4.  Commercial guidelines                           25

5.  SIM cards                                       26

6.  Testing & Activation                            28

7.  Support                                         19

8.  Milestones – Implementation Schedule            30

9.  Interworking presumptions                       31-35







# Introduction

Company offers the following services on the following special terms:

Prohibited Companies:        Any person, firm or body corporate notified to Customer by Company that
                             Company deems it inappropriate to conduct business with.

## (1) GSM Mobile Signaling Service (and extended roaming to existing network operator)

Company will host the required GSM core elements on its own mobile network.

Customer will incorporate the Services within its own products and services only and shall not establish a
situation where Customer is effectively competing with Company to host or provide products or services that
might compete with Company from time to time.

Customer undertakes not directly or indirectly canvass or conduct business with any person, firm or body
corporate that has (or has had in the last two years) an agreement or course of trading with Company or any
other company within the same group ownership of Company.





## (2) SPECIAL TERMS:

MO-SMS BLENDING

In some cases it is not possible for Company to accurately bill MO-SMS IOT charges referred to in Usage-based Charges section (24) in which case a blended rate shall be applied in the sum of 16p per MO-SMS, then assessed quarterly in arrears (with net rebate or additional charge) to reflect the previous quarters blended IOT+8% charge (as per MSA).

NON-COMPETITION RESTRCICTIVE COVENANT

It is a strict condition of this Order that Customer shall not:
  (i)    directly, indirectly or via a third party, provide or otherwise allow or procure a situation whereby a
         party that is or was a customer of Company at the time of execution of this Agreement is directly
         or indirectly provided with any product; service or derivative thereof that relies on any or all of the
         Services provided under this Agreement/Order;
  (ii)   whether directly, indirectly or via a third party make available any service that relies in any way on
         any or all of the Services provided under this Agreement/Order to any party other than an end
         user of Customer – save that this clause does not prohibit Customer from providing its services to
         end users via resellers provided that at all times such resellers do not re-package or otherwise
         attempt to create or re-create a service or derivative service is not directly offered by Company as
         envisaged in this Agreement provided there is no breach of (i) above
  (iii)  announce or otherwise advertise or infer any association of procurement of the Services from
         Company without the prior written consent of Company.

Company acknowledges that:

1) Customer is a ~~manofacturer & distributor of electrical appliances~~ *Marketing, Sales and distributor of Wireless Services, digital accesories & products* and hereby procures the Services from Company to establish a low-cost MVNO which shall be marketed via Customers existing and well developed distribution and supply chain. This channel includes such outlets as Dixons and other electrical stores based air-side; AND

2) Customer has also diversified and wishes to develop the MVNO Service to the US military channel enabling low cost calls back home.

Throughout the duration of this Agreement, and subject strictly to the compliance thereof by Customer, Company is prepared not to offer MVNO Service that knowingly conflicts with (1) and (2) above only.  In respect of this warranty, Customer hereby agrees for the duration of this Agreement not to directly or indirectly enter into an agreement with any other supplier of similar services, save that Company acknowledges and accepts that Customer has ordered 6,000 (six thousand) SIM cards from a competitor and once sold Customer shall have no further dealings with said supplier for the duration of this Agreement.

For the avoidance of doubt this warranty of exclusivity by Customer does not affect any existing or other agreements that Company may have already entered into, or is already in the process of or contemplating entering negotiating and/or entering into.  Customer acknowledges that Company is actively pursuing the establishment of numerous aero-nautical and maritime mobile phone voice & data service/network(s) and retail services which may directly or indirectly compete with (1) and (2) above, and it is hereby expressly agreed that nothing in this Agreement shall preclude or in any way restrict Company from entering into an agreement with any party whatsoever in respect thereof, or in respect of Company directly establishing any mobile network or retail services of any kind whatsoever nationally and internationally the same, whereby for the avoidance of any doubt the same would not constitute a breach the aforementioned exclusivity by Company.

There is no other warranty (express or implied) by Company.

Customer is not at liberty to disclose to any party (or competitor) the nature and effect of each of the parties warranties nor any other mater set out in this Agreement.



# SIM cards & General Description of Service thereupon

Company shall provide all SIM cards; it's the proprietary SIM applications.

Customer shall market and manage its own customers; billing and various services from time to time without application support from Company.

The SIM card applications supplied by Company involve the parsing via USSD (and Customer charged in respect thereof as set out herein) for each Location Update (POST and ACK) and the same in respect of all other USSD commands, for example, call set-up; PIN top-up; balance enquiry and other such functions initiated from or to the SIM card supplied by Company.







SIM SPECIFICATION

[Process colour each side]



| Item No | Data field to use | Font | Height | X pos | Y pos | Format | Comments |
|---|---|---|---|---|---|---|---|
| 1 | PLUGIN_ROW1 | Arial 4 | - | - | - | 5 digits | First 5 digits of ICCID including check digit. E.g. ICCID = 89xx014305092799022-0, PLUGIN_ROW1 = 89450 |
| 2 | PLUGIN_ROW2 | Arial 4 | - | - | - | 5 digits | Second 5 digits of ICCID including check digit. E.g. ICCID = 89xx014305092799022-0, PLUGIN_ROW2 = 14305 |
| 3 | PLUGIN_ROW3 | Arial 4 | - | - | - | 5 digits | Third 5 digits of ICCID including check digit. E.g. ICCID = 89xx014305092799022-0, PLUGIN_ROW3 = 09279 |
| 4 | PLUGIN_ROW4 | Arial 4 | - | - | - | 5 digits | Last 5 digits of ICCID including check digit. E.g. ICCID = 89xx014305092799022-0, PLUGIN_ROW4 = 90220 |
| 5 | PLUGIN_ROW5 | Arial 4 | - | - | - | 5 digits | Profile number printed as a single 5 character word directly under the ICCID on the plug-in i.e. "06W9" (Bluefish) |
| 6 | PRINT_HLR | Arial 4 | - | - | - | 3 digits | 2 digits HLR Code (i.e. 6th , 7th digits of the IMSI) E.g. IMSI = xxxxxx, HLR = |







# Support

Support is accesses 24 hours a day, 365 days a year via the web based customer care portal at the Customer Care Portal (as specified in the MSA).

Support is available electronically with regard to all matters.

Specific problems not capable of being self-administered at the Customer Care Portal shall be raised as a trouble ticket following the guidelines at the customer care portal self service menu. Company will Endeavour to contact customer within 15 minutes in the event of a service affecting outage (if appropriate subject to any prescribed SLA). Matters involving at least fifty percent of the Service being unavailable, or where the Service is critically unstable or unavailable, shall be considered service affecting and shall justify an emergency ticket and resolution as soon as is reasonably practical by Company. All other matters will be dealt with within normal business hours. Tickets raised and work dealt with that is not considered service affecting shall be subject to the standard hourly rate as specified in the MSA.

Tickets not capable of being raised online the Customer Care Portal shall be raised via +44(0)870 119 0000 – selecting the appropriate customer care & escalation options.

Unless specifically stated in this Agreement, time is not of the essence.

## CHANGE REQUESTS

Change requests are also handled at the customer care portal. Any routing or other low level parameters not capable of being actioned by customer shall be requested via the online ticketing system as detailed above.







# Milestones – Implementation Schedule

| Implementation Schedule | | | Company to complete: | | |
|---|---|---|---|---|---|
| | Company | | | Customer: | |
| Responsible department | | Provisioning | SPECIFY: | | |
| Implementation coordinator | | .......................... | Company | .......................... | |
| Phone | | .......................... | Contact person | .......................... | |
| Email | | .......................... | Phone | .......................... | |
| | | | Email | .......................... | |
| ACTION: | | | | Comments: | |
| MSA executed: | | | | Date Planned: | Completed Date: |
| TAP code received (Extended Roaming only) | | | | | |
| IMSI range reserved | | | | | |
| SIMS received | | | | | |
| SIM cards delivered | | | | | |
| Signalling: | | | | | |
| Sigtran link established | Only if (2) req'd: | | | | |
| NDC's | | | | | |
| E214 routing address | | | | | |
| SCCP updated and ref | | | | | |
| Link test | | | | | |
| Link passed | | | | | |
| SMSC: | | | | | |
| Hosted | YES/NO: | | | | |
| SMPP parameters | | | | | |
| SMS-MO test | | | | | |
| SMS-MT test | | | | | |
| SMSC balance check test | | | | | |
| Bilateral Roaming with Company: | | | | | |
| GSMA annexes exchange | | | | | |
| SCCP NDC routing | | | | | |
| IREG tests | | | | | |
| TADIG tests | | | | | |
| Billing verification | | | | | |
| Platform sign-off: | | | | | |
| Platform testing (7) | | | | | |
| Platform passed/failed | | | | | |
| Pass details | | | | | |
| Service activated (8) | | | | | |
| Signed Off | | | | | |
| Engineering Comments | | | | | |
| | | | | | Date |







# Interworking presumptions



# Signaling

The following presumptions and observations are made.

(A) VPLMN is third party/visited MNO's in which the Company designated IMSI's will register pursuant to an agreed commercial arrangement

(B) SS7 transit exists as between the Company network and bilateral partners/MNO's as appropriate

(C) Company network core signaling elements

(D) SS7 interworking with MVNO can either be via direct Sigtran SUA interconnect via GRE tunnel; OR

(E) SS7 interworking with MVNO can be via transit SCCP provider (who routes to/from Company on GT)

(F) MVNO's network

(G) MVNO's SMSC is exposed to Company via SMPP only. MVNO's SMSC is not considered the home SMSC for the purpose of SS7 interworking, as Company provides hosted SMSC for MVNO. MVNO may require private interworking to Company SMSC via SMPP for call control and MT-SMS only.

The **RED** lines identify SS7 (MAP and IN/Camel). Note INAP is not supported (usually only applicable to other mobile operators and in all cases subject to a separate conditional Order). This will be translated (in RED) by default to HTTP, or if selected and appropriate via raw port.

The **BLACK** lines identify SMPP.





# Signaling flow

Scenario 1 - using (D) signaling

N/A.

SMS NOTES

This is handled as default by the Company SMSC (as the Home SMSC).





EXHIBIT C

Case No **HQ09X02026**

**In the High Court of Justice**
**Queen's Bench Division**

**Between:-**

CLOUD9 MOBILE COMMUNICATIONS
(WHOLESALE SERVICES) LTD

<u>Claimant</u>

- and -

BLUEFIRE WIRELESS INC

<u>Defendant</u>

---

### PARTICULARS OF CLAIM

---

1.    The Claimant is a company incorporated in and which has its central administration in the Isle of Man. It is a wholly owned subsidiary of Cloud9 Mobile International Ltd. The Claimant's business includes providing to its customers access to communications technology which can facilitate those customers in selling cheaper overseas mobile phone services to mobile phone users.

2.    The Defendant is a company incorporated in Delaware whose principal place of business is at 515 Madison Avenue, Suite 1910, New York, USA. The Defendant's business includes selling cheaper overseas mobile phone services to mobile phone users. In this particulars of claim those mobile phone users are referred to as "the Defendant's Clients".

3.    At all material times the Defendant was a customer of the Claimant.

4.    On or before 15 May 2007 the Claimant and the Defendant entered into a Master Services Agreement ("the MSA Agreement").

5.    Pursuant to the MSA Agreement on 15 May 2007 the Claimant and the Defendant entered into a services agreement in respect of the specific

1

services identified in an Order form signed and dated 15 May 2007 ("the Order Agreement").

6.    As a result of the MSA Agreement and the Order Agreement (together "the Contract") from May 2007 the Claimant provided services to the Defendant. This claim relates to:

(a)    the Defendant's failure from about October 2008 onwards to pay the charges for those services provided for by the Contract ("the Debt Claim").

(b)    charges incurred and paid by the Claimant as a result of the Defendant's Clients making calls known as mobile originated calls or MOCALLS ("the TIM Mocall Claim").

(c)    A declaration of indemnity in respect of further MOCALL charges incurred by the Defendant's Clients during the course of the Contract but which the Claimant has yet to pay ("the BPL Indemnity Claim").

(d)    A loss of bargain claim arising out of the Defendant's wrongful repudiation of the Order Agreement and/or the Contract ("the Repudiation Claim").

7.    By a letter dated 24 April 2009 the Claimant terminated the Contract and the Debt Claim does not relate to any payment obligations arising after that date and the TIM Mocall Claims and the Indemnity Claim do not relate to any charges incurred after that date. The Claimant's losses arising out of the wrongful termination are claimed below.

The Debt Claim

8.    The Order Agreement set out the following material charges which were payable by the Defendant to the Claimant (not least by section 3.1 of the MSA Agreement which provided for the Defendant to make prompt payment to the Claimant throughout the term of the MSA Agreement):

2

(a)    A monthly charge of £18,000 for a mobile switch partitioning service (see Item (18) in the Order Agreement, "the Rental Charge").

(b)    Network usage charges totalling the charge made to the Claimant as a result of the Defendant and/or the Defendant's Clients making use of mobile phone services plus 8% (see item (24) in the Order Agreement, "the Usage Charge").

9.    Although these charges were payable quarterly in advance in Sterling (in respect of the Usage Charge the intention of the parties was that the Defendant would maintain a credit account from which the Claimant would deduct the charges as they arose), in practice the parties invoiced monthly and in United States Dollars.

**The Rental Charge**

10.    The Defendant has failed to pay to the Claimant the Rental Charge for the months of November and December 2008 or for January, February, March and April 2009. This is a total sum of £108,000.

11.    In error the Claimant provided a number of invoices in respect of the Rental Charge in the sum of US$ 16,800. The error was pointed out to the Defendant (if it was not otherwise apparent) by an email from the Claimant dated 27 February 2009. In any event the Defendant has not paid any sum to the Claimant in respect of the Rental Charge either as invoiced or at all.

12.    The Claimant seeks payment of the Rental Charge in the sum of £108,000 or alternatively £104,400 (allowing for apportionment of the April 2009 charge).

13.    Alternatively the Claimant seeks the same sums as damages.

**The Usage Charge**

14.    The outstanding Usage Charge is calculated in the following way (the particulars have been available to the Defendant on the Claimant's Fixed

3

Mobile Convergence Platform which provides records of material calls made by the Defendant's Clients):

(a)    The total charge to the Claimant as a result of material calls (excluding those calls known as "MOCALLS" which are referred to below and making all necessary adjustments) and including the 8% uplift was US$318,576.59.

(b)    The total amount paid by the Defendant to the Claimant in respect of Usage Charge was US$256,330.82.

(c)    Accordingly the shortfall and amount owed to the Claimant by the Defendant in respect of Usage Charge is US$62,245.70.

15.    The Claimant claims that sum from the Defendant as a debt or alternatively as damages.

The TIM Mocall Claim

16.    The Claimant's system operates by providing international mobile phone calls routed through its own network. As material to this claim, the Claimant provides hardware (in particular SIM cards) which are set up so that the user of a mobile phone containing one of those SIM cards can make international mobile phone calls which are routed through the Claimant's own network.

17.    However it is possible for those SIM cards to be reconfigured so that international mobile phone calls made from those phones are not routed through the Claimant's own network but are routed directly between the maker of the call and the recipient of the call. Such calls are generally known as mobile originated calls or MOCALLS.

18.    The reason the Claimant and the Claimant's customers, such as the Defendant, can offer relatively cheap international mobile phone calls is because of the relevant calls being routed through the Claimant's own network.

4

19.    Mobile phone calls which are not routed through the Claimant's own network incur whatever call charges are applicable to those calls in the normal way.

20.    Such call charges are not logged by the Claimant's system but only become apparent once the Claimant receives a bill for those charges from the relevant agencies with whom the Claimant contracts so as to gain access to the many worldwide mobile phone networks.

21.    One such agency, which the Claimant used until 2008, was called BPL Mobile ("BPL"). The agency which the Claimant moved to from BPL was called Telecom Italia Mobile ("TIM"). The BPL Indemnity Claim, set out below, relates to charges raised by BPL, the TIM Mocall Claim relates to charges raised by TIM.

22.    In about November 2008 the Claimant was notified by BPL that substantial charges in respect of MOCALLS had been built up by the Defendant's Clients, totalling about £1,800,000. The Claimant has not paid that sum or any part thereof to BPL.

23.    From about November 2008 further MOCALL charges were raised by TIM on the Claimant relating to usage by the Defendant's Clients. The total amount of such charges is £106,230. The Claimant has paid those charges to TIM. The detail behind the charges has already been notified to the Defendant by the Claimant.

24.    The following provisions of the Contract obliged the Defendant to pay to the Claimant any charges or costs incurred by the Claimant as a result of the actions of the Defendant and/or the Defendant's Clients:

(a)    the Usage Charge provision quoted at paragraph 8(b) above; and/or

(b)    section 3.5 of the MSA Agreement which states the Defendant *shall be responsible for all Charges incurred in connection with any use of the Services, whether or not it has authorised such use and if Cloud9 incurs any costs, either in connection with a liability to a person or in*

5

*any other way, arising out of any such access or use then Customer shall immediately reimburse such amounts to Cloud9*; and/or

(c)   section (i) 2.6.2 of Annex B of the MSA Agreement, which obliged the Defendant to *be responsible for all its own actions and those of Service Providers and end users / subscribers and hold harmless and indemnify Cloud9 in respect thereof...*; and/or

(d)   section (ii) 1.3.1 of Annex B of the MSA Agreement, which obliged the Defendant to *immediately pay all fines, costs and claims (regulatory or otherwise) incurred by Cloud9 in relation to the Customers' Services and the Numbers/Allocated Numbers*; and/or

(e)   section (ii) 1.10.3 of Annex B of the MSA Agreement, which obliged the Defendant to *be solely responsible for:...the use of the Numbers/Allocated Numbers*.

25.   Further the following provisions of the Contract obliged the Defendant to be responsible if, whether through the actions of the Defendant or the Defendant's Clients, charges were incurred by the Claimant in respect of MOCALLS:

(a)   section 3.4 of the MSA Agreement which obliged the Defendant *to use the Services in accordance with any reasonable operating instructions Cloud9 may provide*; and/or

(b)   section 3.6 of the MSA Agreement which obliged the Defendant to use equipment provided by the Claimant *in accordance with Cloud9's instructions*; and/or

(c)   section 3.7 of the MSA Agreement which obliged the Defendant to *not modify or interfere with the Equipment*; and/or

(d)   section 2.6.2 of annex B of the MSA Agreement which as quoted above made the Defendant responsible for the actions of the Defendant's Clients;

(e)   section 3.19 of annex B of the MSA Agreement by which the Defendant undertook *to use the Services in a manner which generates Revenue for the mutual benefit of the parties to this Agreement.*

26.   If it was not an express term of the Contract that the Defendant was responsible for any charges made on the Claimant as a result of the actions of the Defendant's Clients then it was an implied term of the Contract in order to give business efficacy thereto and/or through obviousness.

27.   By reason of the clauses set out at paragraph 24 above the Defendant is obliged to pay to the Claimant any sums payable by the Claimant to third parties as a result of MOCALLS made by the Defendant's Clients.

28.   By reason of the clauses set out at paragraph 25 and/or 26 above the Defendant was obliged to ensure that the Defendant's Clients did not make MOCALLS and/or was in breach of those clauses when the Defendant's Clients made MOCALLS:

(a)   The particulars of breach are that MOCALLS to a total value of about £1.9 million were made by the Defendant's Clients.

(b)   Such calls could not have been made unless the Defendant and/or the Defendant's clients bypassed the blocking facility installed by the Claimant in the SIM cards provided by the Claimant to the Defendant which would have prevented such calls being made.

(c)   Any such bypassing of the blocking facility was a modification or interference with the Claimant's equipment (i.e. the SIM cards).

(d)   Using the SIM cards to make MOCALLS was contrary to the instructions provided by the Claimant which were to the effect that calls pursuant to the Claimant's service needed to be made via the Claimant's own network (the specific instructions included making calls by placing a "#" at the end of the dialled number).

(e)   Using the SIM cards to make MOCALLS was not generating revenue for the mutual benefit of the Claimant and the Defendant because it

7

exposed the Claimant to the risk of non-recovery from the Defendant and, through the Defendant to the Defendant's Clients.

29.    In the premises the Defendant is obliged to pay to the Claimant the sum of £106,230 being the sum of the TIM Mocall charges paid by the Claimant to TIM.

30.    The Claimant will further argue at trial herein that it should be entitled to charge a further 8% on any MOCALL charges pursuant to the proper operation of the Usage Charge, although the Claimant recognizes that no such charge has been raised to date. The TIM Mocall charges plus 8% amounts to £114,728.40.

31.    Alternatively the Claimant seeks the sum of £106,230 as damages arising out of the Defendant's breaches of the clauses set out in paragraphs 25 and/or 26 above.

The BPL Indemnity Claim

32.    For the reasons set out above in respect of the TIM Mocall Claim, the Claimant seeks a declaration of indemnity in respect of any sums it reasonably pays to BPL in respect of MOCALLS made by the Defendant's Clients which have resulted in charges being raised against the Claimant by BPL.

The Repudiation Claim

33.    The terms of the Contract material to this head of claim include the following and the payment obligations set out above:

(a)    Section 3.1 of the MSA Agreement obliged the Defendant to be responsible for using the Services (i.e. the Order Agreement) and making prompt payments to the Claimant throughout the term of the Agreement (defined so as to include the MSA Agreement and the Order Agreement).

(b)  Sections 4.1 and 4.2 of the MSA Agreement provided for an initial term of 3 years for the MSA Agreement and any orders pursuant to the MSA Agreement. So far as is material this meant that the Contract was agreed to run until at least 15 May 2010.

(c)  Sections 4.3 of the MSA Agreement entitled a party to terminate the Contract if a party in default remained in default within 1 month of receipt of a notice to remedy such default.

34.  In breach of the Contract the Defendant failed to make payment of charges due pursuant to the Agreement (as particularised above) and in a letter dated 12 March 2009 from the Claimant's solicitors to the Defendant notice was given pursuant to Section 4.3 of the MSA Agreement that the Defendant should remedy such failures to pay as were identified in an earlier letter from the Defendant's solicitors dated 4 March 2009.

35.  Further in repudiation of the Contract:

(a)  On 23 March 2009 the Defendant issued a press release which stated, among other things, that the Defendant *had no intention of rekindling its relationship with* [the Claimant] and *has detached itself from* [the Claimant].

(b)  On 26 March 2009 the Defendant's Armand Ventura stated in an email to the Claimant that *we no longer have a business relationship with* [the Claimant].

(c)  These statements amounted to a clear renunciation of the Contract.

36.  By a letter dated 24 April 2009 the Claimant terminated the Contract in reliance on (a) the Defendant's repudiation of the same and (b) the Claimant's contractual right to terminate because of the Defendant remaining in default notwithstanding notice of that default dated 12 March 2009.

37.  As a result of the said termination the Claimant has suffered damages under the following heads (in due course, if necessary, the Claimant will make an allowance for early receipt). Current particulars of loss are contained in an

9

annex to this particulars of claim called "Loss of Bargain" and are in summary:

(a)    Loss of profit from rental income for the balance of term of £227,880.00.

(b)    Loss of profit from anticipated SIM card sales £142,920.00.

(c)    Loss of profit from likely usage fees during the balance of the term £265,072.50.

(d)    A total estimated damages claim of £635,872.50.

(e)    These figures will be subject to expert evidence in due course following disclosure and/or exchange of witness statements.

Interest

38.    The Claimant seeks interest on all sums payable by the Defendant to the Claimant at the rate of 5% a month pursuant to contract and/or at such rate and for such period as the court thinks fit pursuant to Section 35A of the Supreme Court Act 1981.

**The Claimant claims:-**

(1)    Payment of £108,000 or alternatively £104,400

(2)    Alternatively damages in the same sums

(3)    Payment of US$62,245.70

(4)    Alternatively damages in the same sum

(5)    Payment of £106,230 or alternatively £114,728.40

(6)    Alternatively damages in the same sums

(7)    A declaration that the Defendant is obliged to indemnify the Claimant in respect of any sums the Claimant reasonably pays BPL in respect of the

10

alleged £1.8million liability for call charges raised by BPL on the Claimant.

(8)    Alternatively damages to be assessed.

(9)    Damages for repudiatory breach.

(10)    Interest as set out above.

**Nick Parfitt**

## STATEMENT OF TRUTH

The Claimant believes that the facts stated in this particulars of claim are true.

Signed    ...................................................    \

Jean-Cristophe Viguier

Director, Cloud9 Mobile International Ltd

Duly Authorised Signatory for the Claimant

Dated    ...........30. /04 /2009.............

## Annex

### Loss of Bargain

**(1)**     **Contract termination:**

(a)     By Claimant on 24 April 2009, 12 months and 20 days before the end of the initial term.

(b)     20 days is 0.66 months (20 / (365 / 12)).

**(2)**     **Rental income (Order Form item 18):** £18,000 per month x 12.66 months = £227,880.00.

**(3)**     **SIM card sales (including IMSIs) (Order Form item 23):**

(a)     75,000 units minimum purchase obligation; 30,000 purchased; shortfall of 45,000.

(b)     Price per unit £3.97.

(c)     The Claimant's margin per unit is 80%.

(d)     45,000 x £3.97 x 80% = £142,920.00.

**(4)**     **Usage fees:**

(a)     The Order Agreement states at item 23 that *The expectation is Customer will have 25,000 active SIM's within months 12-24, and 38,000 within months 25 to 36.*

(b)     At termination on 24 April 2009 20 days remained of month 24. 20 days is 0.66 months (20 / (365 / 12)). 12 months remained of the period 25-36 months.

(c)     Based on the period June 2008 to November 2008, when the best information is available, the average revenue per Defendant's Client (i.e. per user) per calendar month is £3.74.

(d)     The Claimant's margin on usage fees is 15%.

12

(e)     Therefore loss on usage:

£9,256.50 (0.66 months x 25,000 users x £3.74 x 15%)

Plus:    £255,816.00 (12 months x 38,000 users x £3.74 x 15%)

Total:   £265,072.50

**(5)     Total loss of bargain: £635,872.50**

13

# EXHIBIT D

IN THE HIGH COURT OF JUSTICE                         Claim No. HQ09X02026
QUEEN'S BENCH DIVISION

MASTER ROBERTS

B E T W E E N :

CLOUD9 MOBILE COMMUNICATIONS (WHOLESALE SERVICES) LTD
(a company incorporated in the Isle of Man)

                                                              Claimant

                                        and

                            BLUEFIRE WIRELESS INC
                      (a company incorporated in Delaware, USA)

                                                              Defendant

                              _____
                                 AMENDED ORDER
                              _____

UPON READING the Court file and noting that no acknowledgment of service has
been filed, the Court amended its Order dated 28 July 2009 and sealed on 29 July
2009

IT IS ORDERED that:

1.    Judgment be entered for the Claimant for an amount to be decided by the
      Court, pursuant to CPR 12.3 (1).

2.    The claim be allocated to the multi-track.

3.    There be a Case Management Conference on 12 October 2009 at 2p.m.; Room
      E106; time estimate 45 minutes. The CMC can be at the telephone if the
      parties agree. In this event, one party should notify Master Roberts by email of
      this agreement and make arrangements for the same.

4.    The parties to send their proposed directions by email in word format to
      Master Roberts at Master.Roberts@judiciary.gsi.gov.uk by 9 October 2009.

Dated 31 July 2009